Robert H. LaFLOWER, et al.,
Plaintiffs, Appellants,

v.

UNITED STATES of America, et al.,
Defendants, Appellees.

No. 87-2041.

United States Court of Appeals,
First Circuit.

Heard March 10, 1988.
Decided June 8, 1988.

---

David A. Wojcik with whom Gayle Flanders Weiss and Bowditch & Dewey, Worcester, Mass., were on brief for plaintiffs, appellants.

Mary Elizabeth Carmody, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Wayne A. Budd and Budd, Wiley & Richlin, P.C., Boston, Mass., were on brief for defendants, appellees.

Before BOWNES, Circuit Judge, WISDOM,* Senior Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

After soldier Gary LaFlower was killed in an automobile accident, his parents sued the United States and Prudential Insurance Company to collect the proceeds of his U.S. Army life insurance policy. The relevant statute says that "such insurance shall cease ... at the end of the thirty-first day of a continuous period of ... absence without leave (AWOL)." 38 U.S.C. § 768(a)(1)(B) (1982). And, the district court, after trial, found that the government proved that Gary LaFlower had knowingly been absent without leave for several months prior to the auto accident that caused his death. LaFlower's parents appeal; but, we can find no legal error in the district court's judgment.

A

Appellants argue that the evidence does not support the district court's findings. But, we do not agree. The government presented witnesses and documentary evidence showing the following:

1. The Army ordered LaFlower to leave Fort Ord, California, at the end of May 1980 and to take up new duties with the Army in West Germany at the beginning of July, after a home leave. LaFlower did not go to West Germany. Instead, he remained at home in Spencer, Massachusetts until the auto accident in January 1981.

* Of the Fifth Circuit, sitting by designation.

2. In May at Fort Ord (according to the military personnel directly involved) LaFlower received copies of his orders. He received a plane ticket to West Germany, for which he signed. (See Appendix A.) He made the rounds of various Fort Ord "outprocessing units," at each of which he had to hand in a copy of his orders, and he received from each, in return, a signature or stamp showing completion of the "outprocessing" stage. (See Appendix B.) Personnel at various of these stages explained to him where he was going, and some took actions that made clear that LaFlower was leaving Fort Ord for Army duty elsewhere (*e.g.*, they showed him films about his new work in Germany).

3. LaFlower signed a paper requesting an ordinary leave (which was granted) showing that the leave began May 22 and *terminated* July 6, 1980, when he was to report to McGuire Air Force Base.

4. LaFlower wrote letters to a female friend, indicating that he was in love with her, that he feared his separation from her could ruin their relationship, and that he would try to leave the Army.

5. An Army doctor testified that LaFlower may have tried to obtain a medical discharge by significantly exaggerating certain of his medical problems. Some of LaFlower's statements to his friends supported that possibility.

As against this, and other, evidence of LaFlower's knowledge of his obligations and his possible motive to avoid them, the appellants point primarily to two kinds of testimony. First, they point to testimony by LaFlower's parents and friends that he had *told* them he had received a medical discharge (and had shown some of them a 'medical discharge' certificate). They say LaFlower may reasonably have believed he had been medically discharged since he had had eye problems in the spring of 1980, had gone through a number of tests, and had been restricted to non-field duty temporarily because of the eye problem. The district court, however, did not have to believe that LaFlower was telling the truth, or that he really thought he had such a discharge, particularly in light of testimony by Army witnesses that their opthalmology department had informed LaFlower they could find no physical reason for his eye complaints, that they had never indicated to him that a medical discharge was a possibility, and that no 'medical discharge' document exists.

Second, appellants say there is something suspicious in the fact that the Army now has LaFlower's personnel or "201" file (which included a ticket he had signed for, his "outprocessing" documents, and his request for leave) and that the Army made conflicting notations as to whether the Army or LaFlower had the "201" file after LaFlower left Fort Ord. They deduce from these circumstances that perhaps Fort Ord sent LaFlower's 201 file to Germany, and the German unit sent it back to the United States; that LaFlower then may never have had these documents and therefore might really have thought he was being discharged from Fort Ord on medical grounds.

To reach such a conclusion, however, is to make far too much of far too little. The record, in fact, suggests that LaFlower most likely was "hand-carrying" the file, that his father gave it to Veterans' Services Administration official Robert Lussier after LaFlower's death, that Lussier gave it to an official at the Army Casualty section at Fort Devens, that that official gave it, in turn, to the Army Casualty officer in charge of casualty reports, Sergeant Philip Yates, who testified about its contents. Appellants point to the fact that Lussier gave the court copies of a different, and much skimpier, set of documents. But Lussier's testimony makes clear that he did not remember exactly *which* documents he originally had had, or whether he had taken them to Fort Devens. Other testimony makes clear that the skimpy set of documents Lussier gave the court (plaintiffs' exhibit 1) do not include all those LaFlower's father gave Lussier. Regardless, even if Fort Ord mailed the 201 file to Germany, and the German unit mailed it back, LaFlower's signatures still show Fort Ord could have done so only after he signed the ticket, received his orders, and made his

"outprocessing" rounds. Even though the district court declined to decide what *had* happened to LaFlower's 201 file, it still could reasonably have found that LaFlower knew where he was supposed to go and voluntarily failed to go there.

The district court's findings are not "clearly erroneous." Fed.R.Civ.P. 52(a).

### B

■ Appellants claim that the district court should have required the government to prove its case "beyond reasonable doubt," as the Army must when it court-martials a soldier for unauthorized absence or desertion. Manual for Courts–Martial United States 164 (Art. 85), 165 (Art. 86) (rev. ed. 1969). But the fact that the Army insists upon a criminal standard of proof for the 'criminal-law' type purpose of a court-martial does not, of course, show that Congress had such a standard in mind when it referred to "absence without leave" in the civil statute here at issue. § 768(a)(1)(B). We would need some reason, drawn from the statute, to believe that Congress meant to apply other than an ordinary civil burden of proof in what appears to be an essentially civil dispute. Nor does the case law help appellants. In similar disputes over whether insurance benefits should be denied because a beneficiary may have committed a criminal offense, courts have used the civil burden, requiring only that the insurer demonstrate the likelihood of the disqualifying offense by a preponderance of the evidence. *See e.g., Cerro Gordo Charity v. Fireman's Fund American Insurance Co.,* 819 F.2d 1471, 1487 (8th Cir.1987) (murder); *Palace Entertainment Inc. v. Bituminous Casualty Corp.,* 793 F.2d 842, 843–44 (7th Cir. 1986) (arson); *Joubert v. Travelers Indemnity Co.,* 736 F.2d 191, 193 (4th Cir.1984). *But cf. Malone v. United States Veterans Administration,* 364 F.Supp. 114 (S.D. Ohio 1973) (finding, on weaker evidence, that government failed to meet unspecified burden of proof).

We note that, like the district court, we have assumed, favorably to appellants, that the government bears the burden of prov-ing that LaFlower intended his unauthorized absence. *See Malone, supra.* We need not, and do not, hold that this is so. Rather, we simply hold that, *assuming* the government bears the burden, it has met it. The district court lawfully could forbid the transfer of the money that appellants seek, not because it is *definitely* true that LaFlower knew he was AWOL, but because the court could reasonably find that a "preponderance of the evidence" introduced at trial indicates that this is so.

### C

■ Appellants next point to a set of Army regulations, Army Regulation No. 630–10 (1980), that set forth procedures for army units to follow when members of the armed forces are AWOL. Section 2–4b says:

b. Immediately after a member [fails to report at a "gaining unit"] . . . the unit commander will . . .

(1) Query by telephone [or wire] . . . the following agencies:

(a) The losing unit. . . .

(b) All [military personnel and transportation assistance offices] . . . serving the overseas command (if applicable).

(c) The replacement organization serving the gaining unit . . . (if applicable).

(d) [Department of the Army Headquarters] . . . (career management division). . . .

(2) Keep a 10–day suspense file for replies [and, follow up twice more if necessary].

Section 2–4c says:

C. No action will be taken to report the member AWOL until all queries in b(1) above have been answered.

Appellants argue that the German army unit to which LaFlower was assigned did not make the necessary inquiries. In fact, however, the record shows that at least some of these inquiries were made. A sergeant at Fort Ord testified that he received a call from the German unit about LaFlower. The record contains no information one way or the other about whether other calls were made, or were (under this

regulation) required. But even assuming for argument's sake that the inquiries were not made, the Army's failure to comply with the regulation does not mean a missing soldier is *not* AWOL.

Other sections of this regulation, and other relevant Army rules, make clear that "absentees" are those "who are absent without authority from their ... place of duty for more than 24 hours." Army Regulation 630–10 § 1–3a (referring to those "*not classified administratively* as deserters [*i.e.*, those absent without authority who have been dropped from the rolls, § 1–1c]"); § 2–4d ("effective date [of those going AWOL while in transit] will be the original reporting dat[e] shown in the orders"); *see also* 10 U.S.C. § 886(1) (1982) (defining as AWOL, any soldier who "[without authority] fails to go to his appointed place of duty at the time prescribed"). In contrast, the quoted sections of this regulation deal with the *reporting* of an AWOL soldier, a matter relevant to the record-keeping and follow-up the Army does to ensure that it has sufficient manpower to fulfill its tasks. At least the government tells us this, and its interpretation of its own regulation is a reasonable, and therefore lawful, one. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565–66, 100 S.Ct. 790, 796–97, 63 L.Ed.2d 22 (1980); *Bowles v. Seminole Rock and Sand Co.*, 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); *United States v. Franchi–Forlando*, 838 F.2d 585, 588 (1st Cir.1988). Given this interpretation, even if we assume noncompliance, there is simply no reason to draw "insurance coverage for an AWOL soldier" as a consequence. *See Sullivan v. United States*, 348 U.S. 170, 173–74, 75 S.Ct. 182, 184–85, 99 L.Ed. 210 (1954) (noncompliance with internal directive irrelevant); *cf. United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979) (noncompliance with agency regulations does not mean exclusion of evidence in criminal case).

■ Appellants point to another section of the regulation, § 2–4b, which states that when "a member fails to report ... the unit commander will:

(3) Contact the member's next of kin. This letter will not be written as notice of AWOL. It will simply state that the member did not report to a unit as ordered and that his status is not known. In the letter, request information as to the member's whereabouts."

LaFlower's father testified, without contradiction, that the Army did not contact him, it did not tell him LaFlower was missing and that, had the Army done so, he would have insisted that LaFlower report back. For this reason, appellants claim, the court should estop the government from asserting LaFlower's AWOL status as a defense to their claim for his life insurance.

The short, and conclusive, answer to this claim, however, is that courts will not estop the government in this kind of case (effectively bringing about a result contrary to statute) unless the government has engaged in "affirmative misconduct." *Schweiker v. Hansen*, 450 U.S. 785, 788–89, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981); *Akbarin v. Immigration and Naturalization Service*, 669 F.2d 839, 842 (1st Cir. 1982); *see Best v. Stetson*, 691 F.2d 42, 44 (1st Cir.1982). There is no such misconduct here. *See Immigration and Nationality Service v. Miranda*, 459 U.S. 14, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982) (18 month delay in processing immigration application not "affirmative misconduct"); *Immigration and Naturalization Service v. Hibi*, 414 U.S. 5, 8–9, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973) (failure to publicize naturalization rights or make available naturalization representative not "affirmative misconduct").

Finally, appellants claim that, had the government followed all of these regulations, there would have been a "paper trail," the absence of which shows that LaFlower was not AWOL. The absence of that trail in this record, however, cannot overcome the evidence that LaFlower was intentionally AWOL that we have listed in Part A above.

For these reasons, the judgment of the district court is

*Affirmed.*

APPENDIX A

# TRAVELOPE

**PORT CALL INSTRUCTIONS FOR**

PFC LAFLOVER, GARY   014 54 2888

**REPORT TO**    ARMY

**PASSENGER RESERVATION COUNTER**

**AT**    MCGUIRE AFB, NJ (WRI) AIR TERMINAL

**NOT LATER THAN**  1800  **HRS** ( 6:00  **P M**)

**ON**    6 July    19 80

**FOR FLIGHT**    BKA W2F1A

**TO**    FRANKFURT, GERMANY

MOVEMENTS BRANCH
TRANS & SVCS DIV. DIO
ATTN. AFZW-DI-TSM
FORT ORD. CA 93941

**PREPARED BY** CGA  **DATE** 7 May80

**FOR THE COMMANDER:**

TA FOR LAWSON W COOKE, DAC, TC
*(Issuing Authority's Signature)*

I understand that I (am directed to) (XXX) report to
the above airport/air base for transportation on the
date and time stated on this TRAVELOPE.

*(Traveler's Signature and Date)*    19/may/80

**DA** FORM 1 MAR 77 **4600**

## APPENDIX B

○ Must Clear in ┃ ⸱or  ☐ Ce⸱ al Clearance Available

| INSTALLATION CLEARANCE RECORD | INSTALLATION |
|---|---|
| For use of this form, see AR 210-10; the proponent agency is The Adjutant General's Office. | 4th Inf Div Ft Ord, CA 93941 |

**PREPARE IN DUPLICATE** (Original to be retained in transfer activity file; duplicate to individual.)

| LAST NAME · FIRST NAME · MIDDLE INITIAL | SOCIAL SECURITY NUMBER | GRADE |
|---|---|---|
| LAFLOWER GARY A | 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 | Pfc/E-3 |

| ORGANIZATION | TO DEPART (Time and date) |
|---|---|
| A Bty 1/34 FA Ft Ord, CA 93941 | 22 May 80 |

| AUTHORITY FOR DEPARTURE | NEW DUTY STATION |
|---|---|
| Order # 337-162  3 Dec 79 | 21st Ab Co APO NY 05757 |

### CHECKLIST

(Normally officers, warrant officers, and enlisted personnel in grades E-7, E-8 and E-9 are not required to secure initials of clearing facility, their signature being official indication that all obligations are settled. Other enlisted personnel will normally have facility concerned initial applicable items. Appropriate administrative office will check items not applicable.)

| FACILITY | INITIAL | FACILITY | INITIAL | FACILITY | INITIAL |
|---|---|---|---|---|---|
| 1 ARMY COMMUNITY SERVICE Bldg 3010 | AEG | 12 FAMILY HOUSING/HOUSING REFERRAL OFFICE 2795 | | PROVOST MARSHAL (Veh. Wpn. Pets. Bldg | CLEARED |
| 2 ARMY EDUCATION CENTER Bldg 1010 | AEG | 13 FINANCE OFFICE ETS-2581 PCS-2798 | | 24 REGISTRATION SERVICES OFFICE SUPPORT FUND | |
| 3 ARMY EMERGENCY RELIEF Bldg 3010 | | 14 LIBRARY Bldg 4275 | | 25 SECURITY OFFICER | |
| 4 CAREER COUNSELOR-Unit | | 15 MEDICAL TREATMENT FACILITY (TMC) | | 26 TRANSPORTATION OFFICE | |
| 5 CLASSIFIED DOCUMENTS-S2 | | 16 MILITARY PERSONNEL OFFICE/MILPO | | 27 UNIT MAIL ROOM Change of Address Unit | |
| 6 CLOTHING INSPECTION (AR 700-84) Unit | | 17 ORDERS FOR CHANGE OF STATION | | 28 UNIT SUPPLY Unit | |
| 7 COURTS AND BOARDS | | 18 PERSONAL AFFAIRS OFFICE | | 29 EER(E4-E9)Bldg 2798 | |
| 8 FEDERAL CREDIT UNION | | 19 PERSONNEL REGISTER Unit | | 30 OER(off)Bldg 2835 | |
| 9 DENTAL CLINIC (Member & Depn) | | 20 POST EXCHANGE (Acct Office) Bldg 2867 | | 31 CIF Bldg 2064 | |
| 10 DEPENDENT SCHOOL OFFICE | | 21 POST MOTOR POOL Unit | | 32 Port Call Bldg 2798 PCS Overseas Only | |
| 11 ENLISTED/OFFICER CLUB Fin Disb Ofc Bldg 2437 | | 22 POST TELEPHONE SERVICE Bldg 2223 | NA | 33 Orderly Room (Unit) | NA |

1 For pending reports of survey or disciplinary matters not referred to Company Commanders, only.

I HAVE TURNED IN OR PROPERLY TRANSFERRED ALL CLASSIFIED DOCUMENTS EXCEPT THOSE WHICH PERTAIN TO MY OFFICIAL DUTIES AND FOR WHICH I, AS AN INDIVIDUAL, HAVE BEEN DESIGNATED THE AUTHORIZED CUSTODIAN; I HAVE DISCHARGED ALL PERSONAL DEBTS ADMITTEDLY DUE AND PAYABLE AT THIS TIME IN THIS AREA OR HAVE MADE SATISFACTORY ARRANGEMENTS WITH THE PERSONS OR ORGANIZATIONS CONCERNED FOR THE PAYMENT OF SAME; AND I HAVE FURTHER NOTIFIED OF MY NEXT STATION OR POST OFFICE ADDRESS, ALL OTHER PERSONS WHO ARE KNOWN TO BE PRESENTLY ASSERTING CLAIMS OR DEMANDS AGAINST ME OR WHO HOLD INSTRUMENTS OF INDEBTEDNESS MADE OR INDORSED BY ME. I UNDERSTAND THAT THIS CLEARANCE DOES NOT RELIEVE ME OF ANY PECUNIARY CHARGE FOR GOVERNMENT PROPERTY WHICH HAS BEEN OR MAY BE RAISED ON A REPORT OF SURVEY OR REPORT OF BOARD OF OFFICERS IN LIEU OF REPORT OF SURVEY.

REMARKS

34 PX Rent-All
35 Billeting (Bldg 2798)
36 TASC (Bldg 2852)  NA
37 Reserve Component (Bldg 2798)
(Enlisted ETS and Officer ESA Personnel)

SPEED CRAFT SHOP SEP

I do/do not consent to release the above information to third parties.

Final POR Stamp

POST

| DATE | SIGNATURE |
|---|---|
| 8 May 1980 | |

| SIGNATURE OF COMMANDING OFFICER OR DESIGNATED REPRESENTATIVE |
|---|
| Must BE SIGNED BEFORE POR |

| DATES | | TYPED NAME, GRADE, ARM, AND TITLE |
|---|---|---|
| FROM | TO | |

**DA** FORM OCT 76 **137** OVERPRINT 12  REPLACES EDITION OF 1 JAN 72 WHICH IS OBSOLETE.

Adm. Office, U.S. Courts — Blanchard Press, Inc., Boston, Mass.