**APEX CONSTRUCTION COMPANY,
INC., Plaintiff,**

v.

**UNITED STATES of America,
Defendants.**

C.A. No. 89–34–WF.

United States District Court,
D. Massachusetts.

April 11, 1989.

Jack E. Robinson, Boston, Mass., pro se.

Mike Savage, N. Scituate, Mass., for plaintiff.

Leila Kern, Asst. U.S. Atty., for U.S.

### MEMORANDUM AND ORDER

WOLF, District Judge.

## I. BACKGROUND

On January 5, 1989, Apex Construction Company, Inc. ("Apex") brought this action against the Administrator of the Small Business Administration (the "SBA"), the Director of the National Park Service (the "Park Service") and the Director of the Lowell Historic Preservation Commission of the Department of the Interior (the "Commission"). A motion for preliminary injunction was filed with the complaint. An amended complaint was filed on February 3, 1989.

Apex has been a participant in the SBA's Minority Business and Capital Development Program, known as the "2[8](a) program," since 1984. *See* The Small Business Act, Sections 2[7](j) and 2[8](a), 15 U.S.C. §§ 636(j) and 637(a). This action arises out of the refusal· of the SBA, in 1988, to grant an 2[8](a) subcontract to Apex and its proposed partner, J.L. Marshall and Sons ("Marshall"). Marshall is not individually eligible for the 2[8](a) program and could only participate in an 2[8](a) project with SBA approval, as a joint venturer with an 2[8](a) participant. *See* 13 CFR 121.3 *et seq.*

The proposed Apex–Marshall joint venture at issue in 1988 was for the construction of two projects within the Lowell National Historic Park. These projects are

known as the Boarding House Park Project and the Boott Mill Project. Apex and Marshall had previously worked together under the 2[8](a) program for the Park Service and the Commission in connection with the P.J. Mogan Cultural Center (the "Mogan Project"). The designation of the Boarding House and Boott Mill Projects by the Park Service and the Commission for the 2[8](a) program meant that if the proposed continued Apex–Marshall joint venture was accepted by the SBA, in 1988, for the 2[8](a) work, the projects could be awarded to the partnership without the usually required competitive bidding.

Apex alleges that the SBA improperly failed to subcontract the Boarding House Park and Boott Mill projects to the proposed continued Apex–Marshall joint venture. Apex also alleges that the Park Service and the Commission improperly designated the two projects for the 2[8](a) program in an effort to obtain Marshall's participation, in a joint venture with Apex, without competitive bidding. The amended complaint seeks *only* injunctive relief. Apex does not request money damages. Rather, Apex requests that the Park Service and the Commission be preliminarily enjoined from awarding the Boott Mill and Boarding House Park contracts to anyone other than Apex, and that each contract be awarded to the Apex–Marshall partnership.

The defendants generally deny Apex's allegations. They also assert that Apex is not, in any event, entitled to the relief requested, the award of the contracts to the Apex–Marshall partnership.

As the parties agreed that there would be no material change in the status quo until at least late March, 1989, it was not necessary or appropriate to address the motion for preliminary injunction immediately. Rather, an effort was made to resolve the merits of this matter on a expedited basis.

## II. THE SCOPE OF REVIEW AND THE PENDING MOTIONS

It has been recognized from the outset by Apex, as well as by the defendants and the court, that the scope of the court's review of the SBA's 1988 decision not to accept the Apex–Marshall joint venture for the purposes of the projects at issue here is established by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Section 706(2) provides, in pertinent part, that the reviewing court shall hold unlawful and set aside action found to be:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

\* \* \* \* \* \*

(E) unsupported by substantial evidence subject to [5 U.S.C. §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute.

\* \* \* \* \* \*

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706(2).

Thus, the court's authority to set aside the SBA's action in this case is limited. More specifically, as the court stated in *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983):

Judicial review of an agency's preaward procurement decision is, and should be, extremely limited in scope. The court should not substitute its judgment on such matters for that of the agency but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable. It is the burden of the aggrieved bidder to demonstrate that there was no rational basis for the agency's determinations.

*See also Smith & Wesson v. United States*, 782 F.2d 1074, 1078 (1st Cir.1986); *Information Systems & Networks Corp. v. Abdnor*, 687 F.Supp. 674, 680 (D.D.C. 1988); *Inter–Con Securities Systems v. Orr*, 574 F.Supp. 250, 255–56 (D.D.C.1983).

A fundamental premise of judicial review of agency action is that, absent certain exceptional circumstances, the review is to be based solely on the record before the agency at the time it made its decision and, therefore, no evidence outside the agency

record is usually admissible. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam); *Bradley v. Weinberger*, 483 F.2d 410, 414–15 (1st Cir.1973); *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C.Cir.1981).

A corrollary to this evidentiary limitation is that discovery going beyond the administrative record is not usually permissible because it could not lead to the disclosure of admissible evidence, as required by Fed. R.Civ.P. 26(b)(1). *See Quincy Oil, Inc. v. FEA*, 468 F.Supp. 383, 387–88 (D.Mass. 1979); *Texas Steel Co. v. Donovan*, 93 F.R.D. 619, 620–21 (N.D.Tex.1982); *Exxon v. DOE*, 91 F.R.D. 26, 33 (N.D.Tex.1981).

■ There are, however, certain instances in which discovery of more than the administrative record is permissible and appropriate. Most relevant for this case, additional discovery is appropriate if a plaintiff specifically alleges bad faith and provides a reasonable factual basis for that contention. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971) (usual limitation of discovery to administrative record will be relaxed only upon a strong showing of improper behavior or bad faith); *National Nutritional Foods Assoc. v. FDA*, 491 F.2d 1141, 1145 (2d Cir.1974) (no discovery without a considerable showing of likely bad faith agency conduct), *cert. denied*, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974); *Environmental Defense Fund, Inc. v. Blum*, 458 F.Supp. 650, 663 (D.D.C. 1978) (mere allegations of impropriety "must not serve to allow those disappointed by regulatory activity to invoke all the benefits of the rules of civil procedure for an extensive search into the agen-

cy's decisional processes"). In other words, a plaintiff cannot institute discovery in a case involving review of an agency's action simply in the hope of finding something wrong in what the agency did. *Warren Bank v. Saxon*, 263 F.Supp. 34, 39 (E.D.Mich.1966) (plaintiff may not, after merely alleging arbitrary conduct, depose an agency official "to see whether or not he really is arbitrary"), *aff'd*, 396 F.2d 52 (6th Cir.1968).

■ In this case, Apex has neither specifically alleged nor provided a factual basis reasonably suggesting improper behavior or bad faith by the SBA, or any other basis for extraordinary discovery.[1] Thus, the SBA was required to disclose the administrative record to Apex, but Apex's request for deposition discovery was denied.

At the completion of discovery, the SBA filed a motion for summary judgment and the Park Service and the Commission filed motions to dismiss. In addition, Apex and the SBA each filed affidavits. After briefing by the parties, a hearing was held on March 8, 1989. After consideration of the merits of the pending motions, the court concludes that the SBA's motion for summary judgment and the Park Service and Commission's motions to dismiss should each be granted. The reasons for these decisions are set forth below.

## III. THE SBA'S MOTION FOR SUMMARY JUDGMENT MUST BE GRANTED

### A. *The Summary Judgment Standard*

As a general matter, the court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of

---

1. Other possible grounds for obtaining discovery beyond the administrative record include: 1) cases where the agency decision involves highly scientific or technical matters that may need additional background explanation or clarification for the benefit of the reviewing court (*see Assoc. of Pacific Fisheries v. EPA*, 615 F.2d 794, 811 (9th Cir.1980)); 2) cases where the agency record is, on its face, inadequate to explain the rationale for the agency's decision (in which case discovery limited to supplying that missing explanation may be allowed) (*see Texas Steel Co. v. Donovan*, 93 F.R.D. at 621); 3) cases involving serious agency misconduct (such as bribery or improper *ex parte* contracts) (*Id.*); and 4) discovery of the agency's "contemporaneous construction" of a particular term or regulation where the meaning is vague or ambiguous or where construction used in the particular case appears inconsistent (*see Exxon Corp. v. DOE*, 91 F.R.D. 26, 40–42 (N.D.Texas 1981)). Plaintiff has neither alleged nor provided a reasonable factual basis for expanded discovery on any such ground.

Civil Procedure. Rule 56(c) provides that the court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In addition, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *Stepanischen v. Merchants Despatch Transportation Corp.*, 722 F.2d 922, 928 (1st Cir.1983).

However, to survive a summary judgment challenge on the basis of disputed material facts, the plaintiff must produce substantial evidence, going beyond the allegations of the complaint and supporting the claimed dispute, which would require a judge or jury to resolve the conflicting versions of the truth at trial. *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). *See also Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) (opponent must "do more than simply show that there is some metaphysical doubt as to the material facts").

In this case it is important to recognize that in deciding motions for summary judgment, the court must make two inquiries: (1) whether the factual disputes are genuine, and (2) whether any fact genuinely in dispute is material. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* To determine if the dispute about a material fact is "genuine," the Court must decide whether "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.*

B. *There is Ample Evidence in the Record to Support the SBA Decision*

As explained earlier, absent certain exceptional circumstances, a court may not reverse an agency's decision if the record reveals a rational basis for it. 5 U.S.C. § 706; *Baird Corp. v. United States*, 1 Cl.Ct. at 664; *Smith & Wesson v. United States*, 782 F.2d at 1078. The record in this case provides ample evidence of a rational basis for the SBA's rejection of the proposed continued Apex–Marshall partnership. That evidence includes, but is not limited to, the following.[2]

In 1988, Apex submitted a joint venture agreement to the SBA for approval. (Amended Complaint ("A.C."), ¶ 27; Kleeschulte Aff., p. 14; Agency Record ("A.R."), pp. 171 and 561). Several versions of the joint venture agreement were reviewed by the legal staff of SBA's Region I office. (Russell Aff., ¶¶ 17 and 20; A.R. pp. 69, 171, 561, 576.)

In June, 1988, a revised agreement between Apex and Marshall was sent to the legal staff for review. (A.C., ¶ 27; Russell Aff., ¶ 20; A.R., p. 69.) This document was found to be "legally sufficient" by Mary Laura Russell, Assistant Regional Counsel for the SBA. (Russell Aff., ¶ 21; A.R., pp. 114–115.) Russell's review of this agree-

---

**2.** Although the court makes reference to the affidavits submitted by the defendants, it recognizes that it is the agency record that is the admissible basis for assessing the agency's decision. However, to the extent that these affidavits explain the process by which this decision was made, the court includes them here for clarity. This is appropriate because, as the court noted in *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289 (D.C.Cir.1971), courts have a responsibility to consider the totality of the administrative process in their review of an agency action since "such an approach would serve to ensure the requisite judicial deference to well-reasoned judgments of agency officials acting within the confines of their statutory delegated authority and their own agency regulations." *Id.* at 1298. *See also Camp v. Pitts*, 411 U.S. at 142–43, 93 S.Ct. at 1244 (in certain instances, agency record may be supplemented by affidavits or testimony to amplify reasons for decision).

ment, as well as the earlier version, left her with many concerns about the joint venture itself, which she indicated to the program staff in memoranda of April 19, 1988, and June 7, 1988. (Russell Aff., ¶¶ 16 and 22, Exhibits H and I; A.R., pp. 114–115, 135.)

The program staff review was undertaken in June, 1988, by Dorothy Kleeschulte, the Assistant Regional Administrator for the 2[8](a) program (Kleeschulte Aff., ¶¶ 2 and 15, App. I.) Ms. Kleeschulte reviewed the joint venture agreement submitted by Apex to SBA in 1988 (A.R., p. 69), Apex's business plan and contract files (describing the Apex/Marshall involvement in the Mogan Project, the previous joint venture), as well as information about Marshall. (Kleeschulte Aff. ¶¶ 15a-d, Exhibits G–M; A.R., §§ VII–X.)

Based upon her review, Ms. Kleeschulte concluded that the joint venture agreement should be declined by the SBA for the following reasons: 1) Marshall exceeded the size standard for a small business (Kleeschulte Aff. at ¶ 15a; *see also* A.R., pp. 146–157); 2) Marshall's "responsibility" was questionable given its plea of *nolo contendre* to a misdemeanor in Rhode Island which alleged that it had used a minority firm as a "front" to obtain, noncompetitively, a government contract (Kleeschulte Aff. at ¶ 15b; *see also* A.R., pp. 157–162); 3) Apex and Marshall were not in compliance with other SBA requirements on the previous project (Kleeschulte Aff. at ¶ 15c); and, 4) Apex and Marshall's financial statements for that project indicated that the 2[8](a) company, Apex, was not benefitting as much from joint venture I as required by the 2[8](a) program. (Kleeschulte Aff. at ¶ 15d; *see also* A.R., pp. 196–7.)

By memorandum of June 24, 1988, from the SBA's Regional Administrator to the SBA's Associate Administrator in Washington, the Region recommended declination of the joint venture and gave the same four reasons; *i.e.,* Marshall's unacceptable size, Marshall's questionable integrity, failures by the previous Apex–Marshall joint venture to meet SBA's requirements, and the inadequate financial benefit to Apex in performing the Mogan Project. (Kleeschulte

Aff., ¶ 16, Exhibit N; A.R., p. 23–4.; *see also* A.R., p. 157 for memorandum from the Regional Counsel (F. Conley) to the Regional Administrator (N. Harris) expressing additional legal office "concerns" about Marshall.)

The Washington office of SBA, after an independent review, concurred with the regional program staff's recommendation of declination. The six reasons given in Washington were: 1) Marshall's unacceptable size; 2) concern about the fairness, equity and benefit of the joint venture agreement to Apex; 3) failure of the agreement to meet the requirements of paragraph 19(b)(3)(h) of SOP (Standard Operating Procedure) 80 05 1; 4) failure by Apex and Marshall to comply with the requirements and provisions of joint venture concerning the previous project; 5) Marshall's power under the agreement to exercise "negative control" over Apex; and, 6) questions about Marshall's character because of the Rhode Island plea. (Kleeschulte Aff., ¶ 17, Exhibit O; A.R., pp. 18–22.)

Generally, the concerns about the agreement of both the legal staff, expressed in its memoranda to the program staff (Russell Aff. ¶ 16, Exhibits H and I; A.R., pp. 114, 135 and 157), and of the program staff (Kleeschulte Aff. ¶ 15a-d, App. I) are supported by documents in the agency's records. (*See, e.g.,* Kleeschulte Aff., Exhibits F–L; A.R., pp. 69, 142, 143, 146, 158, 159, 160, 196 and 266; and Russell Aff., Exhibits H–J; A.R., pp. 58, 61, 114, 135 and 157.) This evidence also provides a proper basis for the Acting Associate Administrator's discretionary decision, made in Washington, D.C., to reject the proposed continued Apex–Marshall partnership.

More specifically, to provide examples rather than an exhaustive examination of all of the relevant evidence in the record, the court notes the following. Although Marshall had previously been approved as an appropriate partner for Apex under the 2[8](a) program, there was a rational basis for the SBA's decision to reject the 1988 proposed continued partnership because of Marshall's size. From 1979 to 1987, the

SBA's Standard Operating Procedure provided, in part, that: "An [2][8](a) concern may enter into a Joint Venture Agreement with another approved [2][8](a) concern *or with a nondisadvantaged concern, large or small,* for the purpose of performing a specific 8(a) contract." S.O.P. 80 05, ¶ 49, a. In 1987, however, this provision was cancelled and replaced by a standard with a different size requirement for the parties to a joint venture for an 2[8](a) contract. The new provision states, "A [2][8](a) concern may enter into a Joint Venture Agreement with another [2][8](a) concern *or with a non-disadvantaged concern, determined small,* for the purpose of performing a specific [2][8](a) contract." S.O.P. 80 05 1, ¶ 19, b, (1) (A.R., p. 58, emphasis added)). In early February, 1988, Apex was sent a copy of the new S.O.P. and was explicitly informed that it was "required to submit a Joint Venture Agreement that complies exactly with SOP 80–05 1 (copy attached)." (A.R., p. 192).[3] It is undisputed that Marshall is a "large" concern. Thus, in 1988, the SBA's revised Standard Operating Procedure provided one rational reason not to accept the proposed continued Apex–Marshall partnership as an 2[8](a) joint venture.

Similarly, it is undisputed Marshall had plead *nolo contendre* to a charge of using a minority firm as a "front" to obtain, without competitive bidding, a government contract. Apex correctly alleges that this did not bar Marshall from obtaining government contracts. Nevertheless, it was reasonable, rather than irrational, for the SBA to take the charge and its disposition into account in deciding whether to accept the proposed continued joint venture.

The SBA's concern about the criminal charge regarding Marshall's conduct seems particularly reasonable in view of other concerns reflected in the record. The SBA had not received the quarterly financial reports required by the previously approved joint venture agreement. (A.R., p. 20). In addition, the 1988 agreement concerning the proposed continued Apex–Marshall partnership did not provide that Apex—which had grown substantially since its prior joint venture with Marshall—would maintain the administrative and accounting records, as required by another provision of the SBA's Standard Operating Procedures. (A.R., p. 19). Each of these issues reinforce the reasonableness of the concern the SBA expressed regarding Marshall's possible control over Apex and whether Apex was really obtaining the benefits intended to be promoted by the 2[8](a) program.

C. *There is Inadequate Evidence to Put the Issues of Improper Conduct or Bad Faith In Dispute.*

 Apex essentially acknowledges that the foregoing would constitute a rational basis for the SBA's decision in this case if the SBA's stated reasons were its real reasons for its action. Apex claims, however, that the SBA's stated reasons are merely a pretext to mask its actual, impermissible motives. An agency's actions may be reversed if shown to be a product of bad faith or improper conduct. *See, e.g., Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402 at 416–17, 91 S.Ct. at 823–24; *Kinetic Structures Corp. v. United States,* 6 Cl.Ct. 387, 395 (1984). Apex has not, however, furnished the admissible evidence necessary to create a genuine dis-

---

**3.** The fact that Apex was sent a copy of the relevant SOP concerning size and was told that it would be required to comply with it, among other things, distinguishes this case from *NI Industries v. U.S.,* 841 F.2d 1104 (Fed. Cir.1988). In *NI Industries* the court found that the relevant SOP affected a substantive contractual right and, therefore, had to be published in the Federal Register. It was not published and, indeed, neither the contracting officers for the government nor the affected contractors knew of the provision. Thus, it was impermissible for that provision to be applied in *NI Industries.* In the instant case, it does not appear that Apex had a comparable substantive right to the contracts in question. More importantly, however, Apex had actual, timely notice of the SOP on which the SBA in part relied. Thus, any improper failure to publish the SOP would be immaterial to this case. *See,* 5 U.S.C. § 552(a); *NI Industries v. United States,* 841 F.2d at 1107.

pute concerning any material fact concerning the SBA's motives or conduct.

Apex's principle contention is that animosity between officials of the SBA—particularly the former Assistant Regional Administrator of SBA, Frank Bispham, and his successor Ms. Kleeschulte, among others—motivated the rejection of the proposed continued Apex–Marshall partnership.[4] In essence, Apex contends that Mr. Bispham had supported Apex's earlier proposals over the objections of some of his colleagues and that but for enmity toward Mr. Bispham, his successor would have endorsed the 1988 proposal as well.

The direct "evidence" put forth by Apex to support its claim that the SBA's stated reasons for rejecting the Apex–Marshall partnership were a mere pretext to mask its actual motives is contained in the amended affidavit of Jack E. Robinson, president of Apex. Mr. Robinson states at paragraphs 10(h) and (i) of his affidavit:

> (10) That in support of my belief that the reasons articulated in the letter of Nancy Harris (A.R. pg 23), the memorandum of Darryl Hairson (A.R. pg 19), and the letter of Dorothy Kleeschulte (A.R. pg 16) are pretextual and contrived, I am prepared to prove at trial through oral testimony and documents the following facts:
>
> (h) That I have been told by personnel at the Boston SBA office that personal animosities between individuals at the agency office were the basis for the declination of the Joint Venture.
>
> (i) That I have been told by personnel at the Boston SBA office that it was this personal animosity at the Boston office that motivated Nancy Harris in her letter to Washington concerning declination, Exhibit 20 of Plaintiff's Amended Complaint, to include the sentence "One must question *WHO* really benefitted from this Joint Venture".

Mr. Robinson's affidavit is not, however, sufficient to put any fact genuinely in dispute because it does not meet the requirements of F.R.Civ.P. 56(e). Affidavits fail to comply with the Rule when they are not made on personal knowledge, contain impermissible speculation or conclusory language, do not show affirmatively that the witness is competent to testify to the matters stated, or otherwise fail to set forth facts which would be admissible in evidence. *See Over the Road Drivers, Inc. v. Transport Insurance Co.,* 637 F.2d 816 (1st Cir.1980). What Mr. Robinson may have been told by SBA personnel appears to be inadmissible hearsay. The affidavit does not, for example, provide the information which would be necessary for the court to find Mr. Robinson's report of purported statements by SBA personnel to be admissible pursuant to F.R.Evid. 801(d)(2) concerning admissions by a party-opponent. Moreover, although Apex had ample opportunity to solicit and submit affidavits from SBA personnel who might have substantiated Mr. Robinson's claim, or from Frank Bispham, now a former official of SBA, Apex did not do so. Rather, Apex relied on Mr. Robinson's amended affidavit, which fails to comply with Rule 56(e) and contains only inadmissible information.

The case of *Kinetic Structures Corp. v. United States, supra,* is compatible with the conclusion that the Robinson affidavit is insufficient to create a genuine dispute concerning any fact. In that case, the Court of Claims granted the government's motion for summary judgment despite plaintiff's assertion that the cancellation of its bid solicitation was an arbitrary and capricious action and that it had been treatly unfairly because the government's contracting officer was alleged to have a "personal dislike for the plaintiff's president." 6 Cl.Ct. at 394. The Court of Claims rejected as " 'naked' allegations" plaintiff's statements in affidavits indicating that Ms.

---

**4.** In its Memorandum in Opposition to the Motion for Summary Judgment, on page 5, Apex suggests that certain SBA officials had "personal enmity towards Frank Bishpam ... and/or Apex." At the March 8, 1989, hearing, however, counsel for Apex acknowledge that there was no evidence of any animosity toward Apex and that Apex was not now relying on a claim of any such animosity. Counsel did, however, speculate that expanded discovery might disclose animosity toward Apex.

Huff had told plaintiff's president "that [he] was too aggressive and that as long as she was there, [he] would not get any contracts" and, that she told another affiant that "she did not want to award any contract to Kinetic." 6 Cl.Ct. at 394–5. The court wrote:

The ... affidavit fails to raise a genuine issue of material fact as to Ms. Huff's bad faith. Specifically, the affidavit neglects to set forth the specific factual circumstances surrounding Ms. Huff's alleged statement of dislike for Mr. Haller. It is neither factually precise as to time, as to whom the statement was made, nor as to the accuracy of the content of what was said.

\* \* \* \* \* \*

[Moreover], even assuming that Ms. Huff did not personally like Mr. Haller, the plaintiff has failed to present any evidence, apart from "naked" allegations, that Ms. Huff would have allowed this personal dislike for Mr. Haller to interfere with her responsibilities and duties as a Government contracting officer. As such, the plaintiff has failed to substantiate its claim of bad faith. In view of the strong presumptions of good faith attached to decisions of Government contracting officers, a plaintiff's merely alleging that a contracting officer "did not want to" award a contract to a particular bidder fails to sufficiently raise an issue of material fact which would defeat a defendant's motion for summary judgment. There is absolutely no evidence in either affidavit that would indicate that Ms. Huff would, in bad faith, refuse to award the contract to the plaintiff if the plaintiff had in fact presented a bid that was acceptable and consistent with procurement statutes and regulations.

6 Cl.Ct. at 394–95.

The information on which Apex primarily relies in attempting to defeat the motion for summary judgment in this case does not reach the level found to be inadequate in *Kinetic*. As indicated earlier, Mr. Robinson's affidavit presents only conclusory statements of unidentified individuals which are inadmissible as evidence. The affidavit does not identify Mr. Robinson's alleged sources or describe in any detail what they purportedly said.

Moreover, in contrast to *Kinetic*, Mr. Robinson's affidavit does not indicate that anyone has stated that the SBA's action was motivated by animosity toward Apex. At most, the information presented suggests an intra-agency dispute in a discretionary area. Perhaps, as Apex suggests, the proposed continued Apex Marshall partnership would have been accepted if Mr. Bispham had remained in office. Perhaps the SBA's action in 1988 represented a triumph for those who had opposed Mr. Bispham's support of Apex's projects previously. This would not, however, constitute bad faith or, in the absence of other evidence, render the SBA's 1988 action unreasonable. Reasonable public officials may differ. The information provided by Mr. Robinson in his amended affidavit indicates no more than such a difference in this case.

Despite this lack of direct evidence concerning alleged bad faith, the court has also considered whether there is sufficient circumstantial evidence of bad faith or improper behavior to defeat the SBA's motion for summary judgment. The court concludes there is not.

In its Memorandum in Opposition to the Motion for Summary Judgment ("Apex Memorandum"), Apex addresses several points intended, individually and cumulatively, to put the SBA's good faith and conduct genuinely in dispute. Apex initially contends the SBA did not try to determine the accuracy of the reasons used to decline the proposed continued partnership. (Apex Memorandum at 4–5). As explained earlier, however, the record reflects ample, accurate information to support the SBA's primary concerns.

Apex also asserts that the SBA in various ways acted in a manner which raises a genuine dispute concerning its good faith. More specifically, Apex points out that it was not afforded an opportunity to address the reservations expressed by the Regional Office of the SBA to Washington (Apex Memorandum at 5–6); that the SBA failed

to contact the Park Service or the Commission regarding its concerns (Apex Memorandum at 6–7); and that the SBA did not give Apex a reasonable opportunity to cure any of the alleged defects in the proposed continued partnership arrangement (A.C., ¶¶ 56, 71).

However, an 2[8](a) firm has no absolute right to enter into a joint venture to perform an 2[8](a) contract. *See* 13 C.F.R. § 124.112(a)(17); (A.R., p. 45). Rather, such joint ventures are permissible in certain, limited circumstances. (A.R., pp. 52–68). As Apex acknowledges, "there [was] no requirement that the SBA discuss its concerns [about the proposed continued Apex–Marshall partnership] with Apex." (Apex Memorandum at 7). Similarly, the SBA was not required to discuss its concerns with the Park Service of the Commission. Nor was the SBA required to provide Apex with an opportunity to address its concerns. Finally, the SBA did not have established standards or procedures for appeal or reconsideration of an SBA declination of a proposed joint venture. SOP 80–05.

Thus, while the court for present purposes accepts that the SBA's dealings with Apex may have been formal and harsh, there was no violation of any established SBA procedure. Moreover, the circumstances of the rejection do not suffice to put the SBA's good faith in genuine dispute.

The conclusion that the circumstantial evidence is inadequate to put the SBA's good faith genuinely in dispute is reinforced by reference to the analysis of similar issues in cases involving claims of racial discrimination under Title VII, 42 U.S.C. § 2000e *et seq.* In the Title VII context, the Court of Appeals for the First Circuit has found that a plaintiff "cannot meet his burden of proving 'pretext' simply by refuting or questioning the defendant's articulated reason [for rejecting or firing]." *White v. Vathally*, 732 F.2d 1037, 1042 (1st Cir.), *cert. denied*, 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 267 (1984). Similarly, "merely casting doubt on the employer's articulated reason does not suffice to meet the plaintiff's burden of demonstrating [improper motive]. *Id.* at 1043. Rather, in the Title VII cases, evidence contesting the factual underpinings of the reason for the discharge proffered by the employer is insufficient, without more, to present a jury question." *Dea v. Look*, 810 F.2d 12, 15 (1st Cir.1987).

The foregoing standards are at least equally applicable in this case. Indeed, in view of the limited scope of judicial review in APA cases and the general presumption of regularity of agency decisions (*see, e.g., Citizens to Preserve Overton Park v. Volpe*, 401 U.S. at 415, 91 S.Ct. at 823; *P. Francini & Co. v. United States*, 2 Cl.Ct. 7, 11 (1983)), Apex could arguably be required to meet an even higher standard to defeat the SBA's motion for summary judgment. Apex, however, has not offered adequate circumstantial evidence to meet even the lower standard for putting the SBA's good faith genuinely in dispute.

In view of the foregoing, the evidence looked at in the light most favorable to Apex does not put the factual issue of the SBA's good faith or conduct genuinely in dispute. Thus, as there was a rational basis for the SBA decision at issue in this case, the SBA's motion for summary judgment must be granted.

## IV. THE PARK SERVICE AND COMMISSION'S MOTIONS TO DISMISS MUST BE GRANTED

### A. *The Motion to Dismiss Standard*

When deciding a motion to dismiss, the court must accept the allegations of the complaint as true. *Hughes v. Rowe*, 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980) (per curiam). The court must also examine the alleged facts in the light most favorable to the plaintiff, and the complaint may only be dismissed if "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle [him] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Harper v. Cserr*, 544 F.2d 1121, 1122 (1st Cir.1976). The Park Service and the Commission have met this standard.

Thus, their motions to dismiss must be granted.

### B. Apex Has Failed to State a Claim on Which the Relief Requested May be Granted

The complaint before the court is captioned "Amended Verified Complaint for Declaratory and Injunctive Relief." As the caption suggests, Apex is not seeking money damages. Indeed, the Prayer for Relief does not request a declaratory judgment. Rather, Apex specifically requests only that the defendants be restrained from awarding the two contracts at issue to anyone else and ordered to award those contracts to Apex.

Apex's claims against the Park Service and Commission are alleged in Counts 1 and 2 of the Amended Complaint. In Count 1 Apex alleges that the Park Service and Commission violated the applicable Federal Acquisition Regulation ("FAR") to obtain the services of Marshall, a non-disadvantaged company, under the SBA's 2[8](a) program. (A.C., ¶ 36.) Count 2 alleges that the Park Service and the Commission violated the 2[8](a) set-aside policy by attempting to "obtain a sole source contract at below market prices." (A.C., ¶ 45.) Thus, Apex is asserting that the Park Service and the Commission attempted to use Apex and manipulate the 2[8](a) program to improperly direct the Boott Mill and Boarding House Park Projects to Marshall, at a favorable price, without competitive bidding.

The Park Service and Commission have moved to dismiss Counts 1 and 2. In support of this motion, the Park Service and Commission contend that: (1) plaintiff lacks standing to challenge the set asides by the Park Service and the Commission (see, e.g. Gull Airborne Instruments, Inc. v. Weinberger, 694 F.2d 838, 841 (D.C.Cir. 1982); Dialysis Centers, Ltd. v. Schweiker, 657 F.2d 135, 138 (7th Cir.1981)); and (2) that the decision to set aside the contracts is committed to agency discretion by law and is not subject to judicial review (see, e.g., Heckler v. Chaney, 470 U.S. 821, 828, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); Citi-zens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971)).

The defendants have raised significant questions concerning plaintiff's standing and this court's authority, which Apex has failed to address. It is not, however, necessary for the court to decide these issues. Rather, even assuming, without deciding, that Apex has standing and the court has the authority to review the designation by the Commission and the Park Service of the Boott Mill and Boarding House Park projects for the 2[8](a) program, and assuming that Apex's allegations concerning the conduct of the Park Service and Commission are true, Apex would not be entitled to the sole relief it is seeking—the award of those contracts to Apex. Thus, dismissal pursuant to F.R.Civ.P. 12 is appropriate because Apex has failed to state a claim upon which relief requested may be granted.

Section 2[8](a) of the Small Business Act establishes a program that authorizes the SBA to enter into contracts with other agencies to perform certain services and to subcontract the performance of those services to firms eligible for participation in the program, which is intended to assist minority small business enterprises. The operation of the 2[8](a) program is described, and prescribed, by the Small Business Act, 15 U.S.C.; §§ 636(j) and 637(a), by 13 CFR § 124, and by FAR 19.8. The FAR provides that the SBA and agencies such as the Park Service and the Commission may agree to place a contract in the 2[8](a) program. FAR 19.801(b). If the parties agree to such a placement, the SBA may subcontract the performance of the contract to a firm admitted to the 2[8](a) program. 13 CFR § 124.302. Selection of firms for the 2[8](a) program is, however, a decision to be made solely by the SBA. FAR § 19.802; 13 CFR 124.101 et seq. Moreover, although an individual 2[8](a) contractor may affiliate with another concern for the performance of a subcontract, the SBA must determine that the joint venture complies with SBA requirements for the performance of that contract. 13 CFR §§ 121.3 and 121.4.

In this case, Apex alleges that the Park Service and Commission improperly attempted to place the Boarding House Park and Boott Mill Projects in the 2[8](a) program and asks the court to exercise its equitable authority to accomplish this allegedly improper objective. In the context of the allegations of this case, the relief Apex seeks is impermissible.

As indicated earlier, it is the SBA, not the Park Service or Commission, which had the sole discretion to select an 2[8](a) subcontractor for the Boott Mill and Boarding House Park Projects. Usually "the ultimate grant of a government contract must be left to the discretion of the government agency." *Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052, 1058 (1st Cir. 1987) (quoting *Delta Data Systems Co. v. Webster*, 744 F.2d 197, 204 (D.C.Cir.1984)). There is, however, a limited exception to this principle. "A court may order that a contract be awarded when 'it is clear that, *but for* the illegal behavior of *the agency*, the contract would have been awarded to the party asking the court to order the award.'" *Id.* (emphasis added). This exception would not be applicable in this case, however, even if Apex's allegations concerning the Park Service and Commission were proven.

As described earlier, summary judgment must be granted for the SBA. Thus, at this point, it has been determined that the SBA's conduct was permissible, rather than illegal. The remaining allegations of illegality concern only the Park Service and the Commission. It cannot be said that, 'but for' their allegedly illegal behavior Apex would have been awarded the contracts in question. Rather, if Apex's allegations are accepted as true, it appears that but for the Commission's and Park Service's illegal conduct, the projects would not have been available for possible award to Apex under the 2[8](a) program at all. In this case, Apex has not been deprived of the contracts by any illegal behavior of the Park Service or Commission. Rather, Apex has been deprived of those contracts as a result of the legally permissible actions of the SBA. In these circumstances, an injunction requiring the award of the contracts to Apex would not be warranted as a matter of law. *Id.*

### C. The Doctrine of Estoppel Does not Justify the Relief Apex is Seeking

This foregoing analysis is equally applicable if Apex's request that the court order the contracts at issue be awarded to Apex is analyzed on a theory of estoppel.

Apex has not—or least until very recently—sought to rely on an estoppel theory against the Park Service and Commission.[5]

5. Since the inception of this case, the parties have requested that this court give it urgent attention. Both parties took the position that the contracts in question had to be awarded promptly. Apex perceived a need to obtain the business. The defendants asserted that if construction contracts were not executed by about April 1, 1989, weather and other factors would require a year's delay in the projects, thus injuring the public interest. Therefore, the court has given this case high priority, establishing the expedited discovery, briefing and hearing schedules urged by Apex and the defendants.

Although Apex complained of the alleged inequity of the defendants' conduct, neither its amended complaint nor any of its memoranda claimed Apex was seeking relief on a theory of estoppel. However, at the hearing on March 8, 1989, the court raised, *sua sponte*, whether Apex might have a viable estoppel claim. The defendants cited several cases in opposition to this suggestion. Although the court, in an attempt to be responsive to the parties' requests, had undertaken to attempt to decide the merits of this matter before March 24, 1989, the parties were given an additional two days to address the cases cited by the defendants and brief the estoppel issue. Their supplementary submissions were made on March 10, 1989.

By March 23, 1989, the court had decided to grant defendants' motions to dismiss and for summary judgment and, therefore, to deny Apex's motion for a preliminary injunction. By order of that date the court so informed the parties and offered to schedule promptly a hearing to explain the decision to deny the motion for preliminary injunction if requested to do so by Apex. No such request was made.

On March 27, 1989, an attorney from Washington, D.C. filed a notice of appearance as co-counsel for Apex, made a motion to vacate the judgment of dismissal (which had not entered) and filed a memorandum addressing the issue of estoppel against the government. This submission was untimely and replete with misstatements concerning the proceedings in this case, the record, and the court's orders. This submission also discussed purported facts and forms of relief not raised by the verified amend-

Plaintiff has from the outset alleged and argued, however, that there was a certain inequity in the Park Service and Commission's inducing plaintiff Apex, as a joint venturer with Marshall, to rely on the award of the Boarding House and Boott Mill Projects for work in 1989, only to have SBA decline the joint venture. Thus, the court has considered whether the relief requested by Apex might properly be granted on a theory of estoppel.

The Supreme Court has stressed that the government may not be estopped on the same terms as any other litigant. *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). The Court of Appeals for the First Circuit has noted that:

> The Supreme Court ... has consistently refused to apply the equitable estoppel doctrine against the government, no matter how compelling the circumstances. Justification for this refusal rests primarily upon considerations of sovereign immunity and constitutional grounds ... There is also a vital concern for public policy. In a complex government with thousands of agencies and departments, and innumerable employees, there is a very real need to protect the government against binding commitments by improper conduct of its agents, which might promote fraud or collusion. (footnote and citations omitted).

*Phelps v. Federal Emergency Management Agency*, 785 F.2d 13, 17 (1st Cir. 1986).

This court recognizes, however, that there have been cases—both before and after the Supreme Court's decision in *Heckler v. Community Health Services*—in which the Court of Appeals for the First Circuit has considered circumstances in which the government might be estopped. *See, e.g., LaFlower v. United States*, 849 F.2d 8, 12 (1st Cir.1988) ("courts will not estop the government ... (effectively bringing about a result contrary to statute) unless the government has engaged in 'affirmative misconduct'"); *Best v. Stetson*, 691 F.2d 42, 44 (1st Cir.1982) (noting that "[e]stoppel against the government is unusual; but courts undeniably have the power to estop the government" in holding that courts can estop the government in a case where a policy derived from a regulation that the Supreme Court had declared unconstitutional); *Akbarin v. Immigration and Naturalization Service*, 669 F.2d 839, 842 (1st Cir.1982) (for the government to be estopped, a party must have relied on the government's conduct and the government must have engaged in affirmative misconduct).

In these cases, the Court of Appeals has cited certain elements to be weighed in determining the availability of estoppel against the government:

1) Statements or actions of government officials;

2) reliance to one's detriment;

3) the reasonableness of the reliance; and

4) the risk, through estoppel, that a government official will, in effect, waive congressionally enacted public policy.

*Best v. Stetson*, 691 F.2d at 44. The fourth criterion distinguishes estoppel against the government from estoppel against an ordinary citizen. In *United States v. Ven-Fuel, Inc.*, 758 F.2d 741 (1st Cir.1985), the court stated:

> At a minimum, the party raising the defense must have reasonably relied on some "affirmative misconduct" attributable to the sovereign.... The rationale for the rule is clear: we are, after all, a nation ruled by laws not by men. The possibility of harm to a private party inherent in denying equitable estoppel its wonted reach is often (if not always) grossly outweighed by the pressing pub-

ed complaint or affidavits. The defendants filed an opposition to this submission on March 31, 1989.

The court has considered the latest submissions to the extent that they address issues prop-

erly presented by the amended complaint, motions, and affidavits. Doing so has delayed the issuance of this Memorandum and Order.

lic interest in the enforcement of congressionaly mandated public policy.

758 F.2d at 761 (footnote omitted).

■ Assuming, that it is at times permissible to invoke principles of estoppel against the United States, it would not be appropriate in this case to do so and order that the contracts in question be awarded to Apex. Even if misconduct by the Park Service and Commission caused Apex to hope, or indeed expect, to obtain the subcontracts from the SBA and, therefore, Apex did not solicit other business for 1989, it is not alleged that anyone at the SBA induced that reliance. Nor is it alleged that the SBA in any way waived its usual discretion to determine whether a proposed joint venture met its criteria and ought to be given an 2[8](a) subcontract. Thus, the court concludes that any reliance by Apex on the actions of the Park Service and Commission would not have been reasonable.

■ The court has also considered, however, whether the alleged misconduct of the Park Service and the Commission ought to be the focus of any estoppel analysis. There is only one United States government. Arguably, that government should be bound by the misconduct of any of its agents and Apex should be entitled to an appropriate remedy if it has been injured by the misconduct of any of them.

In this case, however, the 2[8](a) program has an inherent system of checks and balances. At least two agencies must agree to award a contract, without competitive bidding, through the 2[8](a) program. If, as Apex alleges, the Boott Mill and Boarding House Park projects were improperly designated by the Park Service and Commission for the 2[8](a) program in order to obtain the services of Marshall, and that could be considered "affirmative misconduct" by them, it would not be appropriate for this court to remedy that misconduct by ordering the results it improperly sought to achieve. The SBA declined the proposed joint venture, in part because of Marshall's size and SBA's concern with Marshall's controlling the venture contrary to the Small Business Act and SBA policy and practice implementing that law. This prevented the alleged misconduct of the Park Service and Commission from succeeding. In this case, invoking principles of estoppel to order that the contracts in question be awarded to Apex would not effectuate congressionally enacted public policy. Rather, it would accomplish the opposite result.

Indeed, as indicated earlier, the Supreme Court has consistently refused to apply equitable estoppel against the government because "there is a very real need to protect the Government against binding commitments by improper conduct of its agents, which might promote fraud or collusion." *Phelps v. Federal Emergency Management Agency*, 785 F.2d at 17. This consideration is particularly compelling in the instant case.

For the foregoing reasons, Apex has failed to state a claim on which the only relief requested may be granted. Therefore, the present claims against the Park Service and Commission must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

The court notes, however, that it has not been required to address, and has not decided, whether Apex could state a valid claim for damages against the Park Service and Commission. While the court has, in effect, decided that it would not be legally permissible to require the SBA to subcontract the Boott Mill and Boarding House Park projects to Apex, this does not necessarily mean that Apex was not treated inequitably by the Park Service and Commission. The present case, however, fails to state a claim for which the only relief requested may be granted.[6]

## V. ORDER

For the foregoing reasons it is hereby ORDERED that:

---

**6.** If Apex were to file a new action against the Park Service and Commission, seeking damages, the issues of standing and judicial reviewability would have to be decided before the merits could be addressed.

1. The SBA's Motion for Summary Judgment on Counts Three, Four and Five is ALLOWED.

2. The Park Service and the Commission's Motion to Dismiss Counts One and Two is ALLOWED.

3. Judgment shall enter for the defendants forthwith.