**GRANITE STATE INSURANCE COMPANY, Plaintiff–Appellant,**

v.

**SMART MODULAR TECHNOLOGIES, INC., Defendant–Appellee.**

No. 94–16078.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 7, 1995.

Decided Feb. 14, 1996.

David C. Phillips, Goldstein & Phillips, San Francisco, California, for plaintiff-appellant.

James M. Wagstaffe, Cooper, White & Cooper, San Francisco, California, and Joseph Kouri, Bononi & Kouri, Palo Alto, California, for defendant-appellee.

Before: WALLACE and THOMPSON, Circuit Judges, and SEDWICK, District Judge.[*]

DAVID R. THOMPSON, Circuit Judge:

Smart Modular Technologies, Inc. (SMT) and Samsung Semiconductor Inc. (Samsung) entered into an agreement for SMT to build Single Inline Memory Modules (SIMM boards) for Samsung. A component of the SIMM board was a dynamic random access memory chip (DRAM). Samsung owned the DRAMs and delivered them to SMT for SMT to use in building the boards. Samsung retained title to the DRAMs while they were in SMT's possession.

The present dispute arises out of the theft of over $1 million worth of DRAMs from SMT's facility. Samsung's insurer, Granite State Insurance Company (Granite), paid Samsung for the loss and then sought recovery from SMT, asserting its subrogation rights to Samsung's claims for breach of contract and negligence. During a jury trial, the district court granted SMT's motion for judgment as a matter of law. The district court ruled that SMT's affirmative defenses of waiver and equitable estoppel precluded Granite's breach of contract and negligence claims. Granite appeals.

We have jurisdiction under 28 U.S.C. § 1291, and we affirm. We conclude SMT's defense of equitable estoppel precludes Granite from pursuing its claims for breach of contract and negligence. We do not consider SMT's defense of waiver.

## I

## FACTS

Beginning in April or May of 1989, and using DRAMs furnished by Samsung as a component, SMT began assembling SIMM boards for Samsung. Samsung would submit a request for a price quote. SMT would quote a price, and if Samsung accepted that price, Samsung would issue a purchase order. The purchase order contained the terms of the agreement. If the purchase order was accepted by SMT, a work order would follow which provided instructions for building the SIMM boards.

The first purchase order received by SMT from Samsung was in June 1989, for $1,000. That purchase order did not contain accountability language (explained below), but did contain a risk of loss clause on the back side.[1]

SMT became a qualified vendor for Samsung in August 1989. The August 2, 1989 purchase order was for $68,800 and contained the risk of loss clause on the back and the accountability language on the front. The accountability language stated, "[SMT] will be accountable for all DRAMs issued and will return all DRAMs to Samsung in either module, scrap, or unused form."

After receiving the August purchase order, SMT's president, Ajay Shah (Shah) contacted Samsung's purchasing manager, Steven Frevert (Frevert) because Shah was concerned the accountability clause could result in SMT being held financially responsible for the DRAMs while in SMT's possession. Discussions (addressed in more detail below) regarding insurance coverage of the DRAMs then commenced between Samsung and SMT and with their respective insurance carriers.

The next four purchase orders[2] also contained the accountability language on the front of the purchase orders and the risk of loss clause on the back. The September 13, 1989 purchase order did not contain the accountability language, but the accountability

[*] The Honorable John W. Sedwick, United States District Judge for the District of Alaska, sitting by designation.

1. The risk of loss clause provided:
   17. RISK OF LOSS
   Notwithstanding any prior inspections and irrespective of the F.O.B. point named herein, the Seller shall bear all risks of loss, damages, or destruction on the products called for on this order until final acceptance by Samsung at destination. Further, the Seller shall also bear the same risks with respect to any products rejected by Samsung provided, however, that in either case Samsung shall be responsible for any loss occasioned by the gross negligence of its employees acting within the scope of their employment.

2. These purchase orders were: August 2, 1989, for $68,800; August 7, 1989, for $68,000; August 8, 1989, for $1,016,800; and September 1, 1989, for $110,000.

language is included in the September 15 and 20, 1989 purchase orders.

Frevert reviewed Samsung's insurance policy with individuals employed by Samsung's Finance and Treasury Department (Finance Department) and determined the Samsung policy covered the DRAMs while in SMT's possession. Frevert told this to Shah.

SMT's financial officer, Krishnan Shah (Krishnan), asked for written confirmation from Samsung. On September 14, 1989, Y.Q. Kim, the manager of Samsung's Finance Department, sent a facsimile to SMT confirming that "all Samsung Semiconductor, Inc. product held in your facility for assembly is currently insured under our Marine Cargo Policy."

The accountability language was deleted from the purchase orders beginning on November 1, 1989, and continuing until the date of the theft of the DRAMs.[3]

On the evening of February 2, 1990, burglars disabled SMT's alarm system and stole approximately $1.2 million of Samsung's DRAMs. The purchase orders issued after the theft expressly required SMT to obtain insurance "to cover any Samsung devices on consignment."

Pursuant to Samsung's insurance policy, Granite paid Samsung approximately $1.2 million to compensate it for the theft of its DRAMs. Granite then asserted its subrogation rights and brought this action against SMT, alleging claims for breach of contract and negligence.[4]

The district court denied SMT's summary judgment motions. Trial commenced before a jury. After SMT and Granite presented their cases-in-chief, the district court granted SMT's motion for judgment as a matter of law, relying on Federal Rule of Civil Procedure 50(a). Granite timely appeals.

## II

## DISCUSSION

The district court found Samsung had waived Granite's subrogation rights to recover on its breach of contract and negligence claims. As an alternative and only as to Granite's negligence claim, the district court found that, based on Samsung's conduct, Granite was equitably estopped from recovering on its negligence claim.

We may affirm the district court's judgment on any ground supported by the record. *Trimble v. City of Santa Rosa,* 49 F.3d 583, 584 (9th Cir.1995). We conclude the defense of equitable estoppel applies to both the breach of contract claim and the negligence claim, and that the defense bars both claims. Accordingly, we do not consider whether Samsung waived Granite's subrogation rights. Because we do not address the waiver issue, we also do not consider Granite's argument that Frevert did not have actual or ostensible authority to waive Granite's subrogation rights.

### A. Characterization of Equitable Estoppel Defense

The first question we consider is whether the issues raised by SMT's equitable estoppel defense are issues to be resolved by the court or the jury. Our decision of this question requires an analysis of whether the defense of equitable estoppel was historically tried in courts of equity; if so, the defense is one for the court to decide except as to any common issues which may exist between Granite's legal claims for breach of contract and negligence and SMT's equitable defense. *Dollar Sys. v. Avcar Leasing Sys.,* 890 F.2d 165, 170 (9th Cir.1989).

### 1. Equity Versus Common Law Jurisdiction

■ In a diversity action, federal law governs whether a party is entitled to a jury

---

**3.** These purchase orders were: November 1, 1989, for $212,500; three orders on November 30, 1989, for $65,500; 147,000; and $192,000; three orders on December 7, 1989, for $630,000; $420,000; and $262,000; and January 17, 1990, for $15,315.

**4.** Granite, as Samsung's subrogee, is limited to the rights Samsung could assert against SMT. *Firemen's Fund Ins. v. Maryland Casualty,* 21 Cal.App.4th 1586, 1596, 26 Cal.Rptr.2d 762 (1994).

trial and if so, on what issues. *Adams v. Johns–Manville Corp.*, 876 F.2d 702, 709 (9th Cir.1989). The characterization of the issues "as legal or equitable for purposes of whether a right to jury trial is indicated must be made by recourse to federal law." *Simler v. Conner*, 372 U.S. 221, 222, 83 S.Ct. 609, 610–11, 9 L.Ed.2d 691 (1963).

■ A litigant is not entitled to have a jury resolve a disputed affirmative defense if the defense is equitable in nature. *Adams*, 876 F.2d at 709. A defense is equitable in nature if it could have been asserted in a court of equity, or in a court of law after the passage of the Law and Equity Act of 1915.[5] 5 James W. Moore, Moore's Federal Practice ¶ 38.11[6] (2d ed. 1995); *see also Adams*, 876 F.2d at 709; *In re U.S. Fin. Sec. Litig.*, 609 F.2d 411, 422 (9th Cir.1979), *cert. denied*, 446 U.S. 929, 100 S.Ct. 1866, 64 L.Ed.2d 281 (1980); *Liberty Oil Co. v. Condon Nat'l Bank*, 260 U.S. 235, 242–43, 43 S.Ct. 118, 120–21, 67 L.Ed. 232 (1922).

■ "The doctrine of equitable estoppel is pre-eminently the creature of equity." 3 John N. Pomeroy, Equity Jurisprudence § 802 (Spencer W. Symons 5th ed. 1941). The defense is intended to promote "equity and justice of the individual case by preventing a party from asserting his rights under a general technical rule of law, when he has so conducted himself that it would be contrary to equity and good conscience...." *Id.* (citation omitted). The defense was originally available only in courts of equity. 2 Fred F. Lawrence, Equity Jurisprudence §§ 1044, 1046 (1929).

We conclude that because the defense of equitable estoppel was originally available only in courts of equity, it is equitable in nature and, therefore, except for any issues which may be common to Granite's legal claims, SMT's equitable estoppel defense presents issues to be resolved by the court.

2. Whether Common Issues Exist

■ Neither party disputes that Granite's claims for breach of contract and negligence are legal claims. In *Beacon Theatres v. Westover*, 359 U.S. 500, 510–11, 79 S.Ct. 948, 956–57, 3 L.Ed.2d 988 (1959), the Supreme Court concluded a party does not lose the right to a jury trial on legal issues when legal and equitable claims are joined in the same action. The Supreme Court later clarified that the right to a jury trial on legal issues may not be infringed "by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims." *Ross v. Bernhard*, 396 U.S. 531, 537–38, 90 S.Ct. 733, 737–38, 24 L.Ed.2d 729 (1970). "Thus, where there are issues common to both the equitable and legal claims, 'the legal claims involved in the action must be determined prior to any final court determination of [the] equitable claims.'" *Dollar*, 890 F.2d at 170 (quoting *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479, 82 S.Ct. 894, 900–01, 8 L.Ed.2d 44 (1962)). If the legal and equitable claims do not involve common issues, the district court has discretion to regulate the order of trial. *Dollar*, 890 F.2d at 170–71.

In its complaint, Granite alleged that the risk of loss clause and the accountability language in the purchase orders imposed the risk of loss on SMT for the DRAMs while in SMT's possession. Granite also alleged SMT negligently controlled, operated, or maintained the security alarm system at its facility. Granite makes the same assertions in the parties' joint pretrial statement. In its trial brief, Granite argues the contract was never orally modified, but even if it was, any oral modification was invalid because it violated the statute of frauds.

SMT's equitable estoppel defense was that it justifiably relied on Frevert's representations, the facsimile from Kim, and the deletion of the accountability language to conclude that Samsung had assumed the risk of loss for the DRAMs and that SMT did not need to obtain duplicate insurance.

These are distinct rather than common issues. In applying SMT's equitable estop-

---

5. Section 274b of this Act permitted the assertion of equitable defenses in actions at law, relieving the defendant from asserting a separate action in a court of equity. 2 James W. Moore, Moore's Federal Practice ¶ 2.05[2] (2d ed. 1995); *Liberty Oil Co. v. Condon Nat'l Bank*, 260 U.S. 235, 240–41, 43 S.Ct. 118, 120–21, 67 L.Ed. 232 (1922).

pel defense to the breach of contract claim, we do not need to address whether the contract in fact imposed the risk of loss on SMT. Even assuming the contract imposed such liability, Granite was estopped by Samsung's conduct from asserting that liability.

The issues relevant to the negligence claim are even more distinct. The district court did not need to make a finding as to whether SMT negligently operated or controlled its security system. The district court had only to determine whether SMT justifiably relied on Samsung's conduct, and whether SMT suffered a loss as a result. Because these issues are distinct, the equitable estoppel issues were for the court to decide.

### B. Standard of Review

■ Because the district court, not the jury, was the appropriate trier of fact on SMT's equitable estoppel defense, we review the district court's factual findings under the clearly erroneous standard, and review de novo its legal conclusions. *Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382, 384–85 (9th Cir.1994). "[R]eview under the 'clearly erroneous standard' is significantly deferential, requiring a 'definite and firm conviction that a mistake has been committed.'" *Concrete Pipe & Prods. v. Construction Laborers Pension Trust*, 508 U.S. 602, ——, 113 S.Ct. 2264, 2280, 124 L.Ed.2d 539 (1993).

■ Under the clearly erroneous standard, the reviewing court may not reverse the district court's findings "simply because it is convinced that it would have decided the case differently." *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *see also Service Employees Int'l Union v. Fair Political Practices Comm'n*, 955 F.2d 1312, 1317 n. 7 (9th Cir.), *cert. denied*, 505 U.S. 1230, 112 S.Ct. 3056, 3057, 120 L.Ed.2d 922 (1992). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511.

### C. Application of Standard

■ California law governs the underlying merits of the dispute. Under California law, the elements of equitable estoppel are:

(1) the party to be estopped must be apprised of the facts; (2) [the party to be estopped] must intend that his conduct shall be relied upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the [party asserting estoppel] must be ignorant of the true state of facts; and (4) [the party asserting estoppel] must rely upon the conduct to his injury.

*Driscoll v. City of Los Angeles*, 67 Cal.2d 297, 61 Cal.Rptr. 661, 666, 431 P.2d 245, 250 (1967).

■ SMT presented persuasive evidence on its defense of equitable estoppel. Accountability language appeared on the purchase orders only after SMT became a qualified Samsung vendor and the purchase orders significantly increased. At that time, Shah and Frevert began discussing who was responsible for the DRAMs at SMT's facility. Shah told Frevert that, if SMT needed to obtain insurance, SMT would have to raise its prices because it had not factored in the price of insurance in its negotiations with Samsung.

Shah testified Frevert "was determined that the pricing should not go up and suggested that we could try to resolve the insurance issue in a separate way." Shah further testified he and Frevert believed "the efficient way to do this would—would be not to duplicate insurance. If Samsung already had insurance and took responsibility for product at [SMT's] facility, then [SMT] would not duplicate that insurance."

Shah and Frevert both testified Frevert stated he would review Samsung's insurance policy to determine the extent of Samsung's coverage for the DRAMs. Shah testified Frevert was going to discuss the matter with the persons responsible for Samsung's insurance at the Finance Department and "was going to ask them if it was okay for Samsung to take up the responsibility and for [SMT] not to have to duplicate insurance for Samsung's product while it was at [SMT's] facility."

Frevert testified he reviewed Samsung's insurance policy with Janet Palisco and

Kristi Koch, who were employed by Samsung's Finance Department. He testified that after Shah raised the risk of loss issue, he reviewed Samsung's insurance policy to "make sure we were not double insuring the product." After reviewing the policy, Frevert, Palisco, and Koch believed the policy covered the DRAMs while at SMT's facility.

Frevert testified he then told Shah that Samsung's policy covered the DRAMs while in SMT's possession. When asked about the substance of the discussion, Frevert testified, "I believe it was very simple. We just, you know, discussed that we were covered and that was no longer an issue. In fact there was always price pressure to bring the price down, so that was—we were sort of going in the correct direction." Shah testified that Frevert told him "that Samsung had a comprehensive insurance policy ... and that while the DRAMs were—were on [SMT's] premises that [SMT] should not need to take insurance as a duplication of their own." Shah also stated Frevert said he would remove the accountability language.

Frevert testified Krishnan contacted him for written confirmation and he told her to contact Koch at the Finance Department. Krishnan testified she contacted Koch and asked for "written assurance on the fact that Samsung was insuring their DRAMs while at [SMT's] location." Krishnan explained to Koch that, "since Samsung was insuring its product we at [SMT] would therefore not be duplicating that insurance coverage." Krishnan testified Koch stated she needed to "check into it."

Shortly after that conversation, SMT received the September 14, 1989, facsimile from Kim, which provided, "Per your request to Kristi Koch by phone today, I wish to verify that all Samsung Semiconductor, Inc. product held in your facility for assembly is currently insured under our Marine Cargo Policy." The evidence established that Kim, the manager of Samsung's Finance Department, was responsible for Samsung's insurance matters.

Frevert, Shah, and Krishnan testified that, based on Frevert's communications and Kim's facsimile, they believed Samsung had assumed responsibility for any loss occurring to the DRAMs while at SMT's facility. Specifically, Frevert testified:

Q: After your conversation with Mr. Shah and after your review of the September 14 memo, did you have an understanding as to who would be responsible between [SMT] and Samsung in the event of a loss of the product through theft.

·   ·   ·   ·   ·

A: Yes, that would be Samsung's responsibility.

Krishnan testified she understood Samsung had "an all risk policy" and would be responsible for a loss to the DRAMs resulting from "any unforeseeable event."

After these discussions, the accountability language was removed from the purchase orders. Samsung did not require SMT to carry duplicate insurance until after the theft.[6]

This evidence strongly favors SMT. The most persuasive rebuttal evidence offered by Granite was testimony from Joanne Schults, an account representative employed by SMT's insurance agent. Schults stated that, during the fall of 1989, she had many discussions with Krishnan relating to the coverage of customers' goods while at SMT's facility. Schults testified she explicitly told Krishnan that SMT should obtain a waiver of subrogation or some other type of contract clause which expressly stated who was responsible for a loss to the DRAMs while at SMT's facility. Schults responded she never told Krishnan duplicate insurance was unnecessary if Samsung insured its product while at SMT's facility. Despite knowledge that SMT should obtain specific language stating that SMT was relieved from liability and Samsung assumed responsibility, SMT did not obtain such a contractual clause.

Further, Granite presented evidence supporting its argument that SMT's failure to obtain duplicate insurance was not based on

---

**6.** The purchase orders after the theft provided, "[SMT] will maintain insurance to cover any Samsung devices on consignment. [SMT] will list Samsung Semiconductor, Inc. on their insurance policy as an additional insured party."

an understanding that such insurance was unnecessary. Granite contended SMT did not obtain duplicate insurance because the cost of the insurance was too high. Rosemary Bardi Ambrose, an executive assistant for SMT's insurance agent, testified Krishnan called constantly with questions about duplicate insurance and "never seemed confident about who was covering what." Ambrose also testified the only reason Krishnan gave her for not obtaining duplicate insurance was the high cost of the premiums.

The district court heard all of the evidence and found that with regard to Granite's negligence claim, SMT established the elements of its affirmative defense of equitable estoppel. We cannot say this finding is clearly erroneous.

■ Granite's public policy argument also fails. California permits parties to agree to relieve a party from liability resulting from its own negligence. *Goldman v. Ecco–Phoenix Elec. Corp.*, 62 Cal.2d 40, 41 Cal.Rptr. 73, 75, 396 P.2d 377, 379 (1964). In the present case, SMT presented evidence that the parties agreed to relieve SMT from liability for loss to the DRAMs resulting from "any unforeseeable event."

While this agreement might not be sufficient to relieve SMT from liability under California law for active negligence, a question on which we express no opinion, it is sufficient to relieve SMT from any negligence in this case, because here, even if SMT were negligent, that negligence was passive at most. *See Rossmoor Sanitation v. Pylon, Inc.*, 13 Cal.3d 622, 119 Cal.Rptr. 449, 452, 532 P.2d 97, 100 (1975).

SMT's evidence also established that Granite was estopped from pursuing its breach of contract claim. Krishnan informed individuals responsible for Samsung's insurance that the reason for determining the coverage of Samsung's policy was to avoid a duplication of insurance. Based on Samsung's conduct, SMT was led to believe it would not be responsible for loss of the DRAMs and that it was not required to obtain duplicate insurance. Specifically, SMT relied on Frevert's representations that Samsung's policy covered the DRAMs while at SMT's facility, on Kim's facsimile verifying the extent of Sam-

sung's insurance, and on the subsequent deletion of the accountability language from the purchase orders. SMT detrimentally relied on Samsung's actions by not obtaining duplicate insurance. This reliance was reasonable.

The continuing presence of the risk of loss clause on the back side of the purchase orders does not undermine SMT's equitable estoppel defense. The evidence indicates the parties specifically addressed who would assume the risk of loss to the DRAMs delivered to SMT's facility. They never mentioned the risk of loss clause during these discussions. Samsung's silence about any impact the risk of loss clause might have, while Samsung led SMT to believe SMT was relieved from liability for loss of the DRAMS, supports the reasonableness of SMT's reliance notwithstanding the language of the risk of loss clause.

The evidence also supports the district court's finding that equitable estoppel precludes Granite's recovery for the loss of the DRAMs delivered prior to November 1989, when the accountability language was first deleted from the purchase orders. Shah and Krishnan testified that during their discussions with Samsung, the parties were discussing all the DRAMs that had been and would be delivered. These discussions were not limited to the DRAMs that would be delivered after deletion of the accountability language.

### D. Opportunity to Be Heard

■ After Granite and SMT presented their cases-in-chief, the district court asked Granite to make an offer of proof regarding its rebuttal evidence to SMT's affirmative defenses. Granite argues the district court should have permitted it to present live testimony. It contends the district court did not give it an adequate opportunity to be heard before granting judgment under Federal Rule of Civil Procedure 50(a).

■ As discussed above, the issue of equitable estoppel was for the court, not the jury. Rule 50(a) applies only to issues tried by a jury. Fed.R.Civ.P. 50(a). Federal Rule of Civil Procedure 52 governs issues tried by

the court. Fed.R.Civ.P. 52. Therefore, Rule 52 controls our analysis of whether the court gave Granite an adequate opportunity to be heard.

Rule 52(c) provides the court may enter judgment after a party has been "fully heard." The advisory committee notes state that the rule "authorizes the court to enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence." Fed.R.Civ.P. 52(c) advisory committee's note. Rule 52(c) replaced a portion of Rule 41(b) which permitted the court to dismiss an action after the close of the plaintiff's case-in-chief. *Id.;* 9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2573.1 (1995).

We conclude the offer of proof was an appropriate means for the court to receive and consider Granite's proffered evidence. The court was not required to receive live testimony. *See Stone v. Millstein,* 804 F.2d 1434, 1437–38 (9th Cir.1986) (interpreting prior Rule 41(b)).

E. Evidentiary Rulings

Finally, Granite argues the district court erred by (1) admitting evidence of Frevert's, Shah's, and Krishnan's subjective understandings of the agreement between Samsung and SMT; and (2) excluding evidence possibly implicating an SMT officer in the theft of the DRAMs.

■ With regard to evidence of the parties' subjective understandings of the agreement, the issue in this case is not what the parties' contract said or what they intended that contract to say. The issue is whether, because of Samsung's conduct, Granite is equitably estopped from attempting to impose liability on SMT for the loss of the DRAMs. The evidence received by the district court was relevant to this issue and was properly admitted.

Nor did the district court err by excluding evidence that the burglary could have been an "inside job" and evidence that the results of a polygraph examination of Mukesh Patel, an officer of SMT, indicated the possibility of deception.

■ Evidence indicating the theft was an inside job was admitted during Granite's redirect examination of Officer Curtis Codey. In response to questions from Granite's counsel, Codey testified, "The persons who were responsible for this burglary had insider information...." He testified he came to this conclusion because the burglars had knowledge of the alarm system, the floor plan, the location of the motion detectors, the equipment needed to access the DRAMs, and the quantity of the product at SMT's facility at the time of the theft. The substance of the evidence Granite complains was excluded was ultimately admitted.

■ With regard to the district court's refusal to admit the results of the polygraph test, the admission of such evidence is disfavored because of the questionable reliability of the polygraph test and the "overwhelming potential for prejudice." *Brown v. Darcy,* 783 F.2d 1389, 1394–96 (9th Cir.1986).

III

CONCLUSION

The question whether Granite was equitably estopped from asserting claims for breach of contract and negligence presented an issue to be decided by the court, not the jury. Granite was given an adequate opportunity to be heard. The district court did not clearly err in resolving the equitable estoppel issue in favor of SMT, nor did it abuse its discretion by its evidentiary rulings.

AFFIRMED.