**In re LUDLOW HOSPITAL SOCIETY, INC., Debtor.**

**David J. NOONAN, Trustee, Plaintiff, Appellant,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee.**

**No. 97–1014.**

United States Court of Appeals, First Circuit.

Heard June 4, 1997.

Decided Aug. 13, 1997.

Claudia J. Reed, Springfield, MA, with whom David J. Noonan and Cohen, Rosenthal P.C. were on brief for appellant.

Jeffrey Clair, Attorney, Appellate Staff Civil Division, Department of Justice, with whom Frank W. Hunger, Assistant Attorney General, Washington, DC, Donald K. Stern, United States Attorney, Boston, MA, and William Kanter, Attorney, Appellate Staff Civil Division, Department of Justice, Washington, DC, were on brief, for appellee.

Before TORRUELLA, Chief Judge, CYR, Senior Circuit Judge, and BOUDIN, Circuit Judge.

CYR, Senior Circuit Judge.

David J. Noonan, chapter 7 trustee ("the Trustee") for Ludlow Hospital Society, Inc. ("the Hospital"), appeals a district court judgment vacating two bankruptcy court orders entered pursuant to Bankruptcy Code § 105, 11 U.S.C. § 105(a). The challenged orders purportedly extended the one-year regulatory deadline imposed by the Secretary, United States Department of Health and Human Services ("HHS"), for hospitals formerly participating in the Medicare program to sell their capital assets and claim supplemental reimbursement from HHS for certain capital-asset depreciation credits. As we conclude that the bankruptcy court exceeded its equitable powers under Bankruptcy Code § 105, we affirm the district court judgment.

# I

## *BACKGROUND*

Until it closed on February 17, 1995, the Hospital had participated in the Medicare

program, receiving annual HHS reimbursements for inpatient operating costs, as well as capital-asset depreciation credits, relating to its provision of services to Medicare recipients. Participating hospitals which retain ownership of the capital assets used to provide services to their Medicare recipients are entitled to periodic reimbursement for estimated actual depreciation on those assets, as determined under accepted accounting practices. *See* 42 U.S.C. § 1395x(v)(1)(O)(ii) (Medicare statute authorizing HHS Secretary to implement regulations detailing asset-depreciation methodologies).[1]

Upon its closure, the Hospital's participation in the Medicare program terminated as well.[2] HHS administrative regulations allow a one-year post-termination period within which hospitals that previously participated in the Medicare program must sell their Medicare-related capital assets as a precondition to recapturing any pretermitted capital-asset depreciation credits from HHS. *See* 42 C.F.R. § 413.134(f)(3). Thus, a hospital which has closed would be eligible for further depreciation reimbursements from HHS on a Medicare-related capital asset which was sold within one year after its closure for less than its depreciated basis.[3]

At the time, HHS regulations allowed hospitals forty-five days after their withdrawal from the Medicare program to submit a final report outlining all reimbursable Medicare costs incurred prior to their withdrawal. *See id.* § 413.24(f) (1994). An administrative extension could be obtained from HHS on a showing that hospital operations had been "significantly affected due to extraordinary circumstances over which the [hospital] ha[d] no control, such as flood or fire." *Id.* § 413.24(f)(2)(ii) (1994). The HHS regulations likewise allow hospitals a three-year period within which to reopen and amend a final cost report which was timely filed. *See id.* § 405.1885. Without opposition from the government, the Trustee obtained two extensions of the forty-five-day filing deadline from the bankruptcy court and the Hospital's final cost report was submitted to HHS within the extended deadline.[4]

The Trustee proceeded to attempt to sell the Hospital's capital assets, anticipating that the sale price might not equal their depreciated basis, *see supra* notes 1 & 3, and that the chapter 7 estate might therefore claim supplemental Medicare reimbursements under the aforementioned HHS capital-asset-depreciation-adjustment provision. *See id.* § 413.134(f)(3). It soon became apparent, however, that the capital assets could not be sold by February 17, 1996, the first anniversary of the Hospital's closure and the deadline for realizing a depreciation-adjustment reimbursement under 42 C.F.R. § 413.134(f)(3).

Therefore, on February 8, 1996, the Trustee sought equitable relief from the bankruptcy court under Bankruptcy Code § 105(a), extending the *one-year* period for selling the Hospital's capital assets beyond the original February 17 deadline, in order not to forfeit the potential depreciation-adjustment claim. The Secretary objected, on the grounds that 42 C.F.R. § 413.134(f)(3) itself permits neither exceptions nor extensions and that the bankruptcy court accordingly lacked the eq-

---

1. The HHS depreciation methodology is similar to that utilized for federal tax purposes. For example, a CAT scanner worth $1,000,000, with an estimated useful life of 25 years, might receive an HHS depreciation reimbursement of $40,000 per year over a 25–year period. *See generally* 42 C.F.R. § 413.134(a)-(d).

2. On the same day, the Hospital filed a voluntary chapter 7 petition.

3. Under our hypothetical, *see supra* note 1, if a hospital held the Medicare-related capital asset for ten years, its depreciated basis would be $600,000, since HHS already would have reimbursed the hospital $40,000 per annum for estimated depreciation during the ten-year period, for a total of $400,000. The "depreciated basis" would be $600,000—its $1 million original cost, less $400,000 in estimated depreciation. Were the asset to sell for only $500,000, therefore, § 413.134(f)(3) would permit the hospital to apply for the $100,000 shortfall between the depreciated basis ($600,000) and the actual sale price ($500,000).

4. Although the first motion for extension was not served on the government, an Assistant United States Attorney verbally assured the Trustee that the government would not oppose the extension. Two months later, the Trustee served the second motion on the government, but the bankruptcy court granted it without awaiting a response from the government.

uitable power to engraft an exception, pursuant to Bankruptcy Code § 105(a), which would bestow "substantive rights" upon the chapter 7 estate not authorized under the HHS regulations.

The bankruptcy court granted the extension over the Secretary's objection.[5] It relied upon the equitable powers conferred by Bankruptcy Code § 105(a), reasoning that: (1) in the special context of bankruptcy proceedings, the rigid one-year HHS deadline for selling capital assets was unreasonable, since a newly-appointed trustee may require more time to marshal estate assets; (2) strict compliance with the one-year HHS deadline would result in a "windfall" to HHS and deprive the Hospital of valuable assets (*viz.*, depreciation-adjustment reimbursements), to which it would otherwise be "entitled;" (3) an extension would not harm HHS, as the Trustee would not be allowed to file a depreciation-adjustment reimbursement claim based on the appraised value of the capital assets after February 17, 1996; and (4) HHS was estopped from contesting the bankruptcy court order, as it had acquiesced in two previous extensions of the *forty-five-day* period for filing the final cost report, *see* 42 C.F.R. § 413.24(f); *supra* note 4.

The district court vacated the bankruptcy court order on intermediate appeal and the Trustee appealed. Meanwhile, the Trustee consummated a sale of the capital assets and submitted a reimbursement claim to HHS, estimated at between $300,000 and $1,000,-000.

## II

### *DISCUSSION*

#### A. *Equitable Estoppel* [6]

The Trustee first insists that HHS is estopped from claiming that the bankruptcy court lacked authority, under Bankruptcy Code § 105(a), to extend the *one-year* filing deadline prescribed in § 413.134(f)(3), since the government had acquiesced in two earlier bankruptcy court extensions of the *forty-five-day* deadline for filing the Hospital's final cost report.[7] The Trustee essentially suggests that the verbal assurances from government counsel, *see supra* note 4, that there would be no opposition to the two extensions of the *forty-five-day* period for filing the final cost report, coupled with HHS acquiescence thereto, make this an "unusual" case in which equitable estoppel may be invoked against the government. The Trustee argues that the district court erred in ruling that he needed to show that the government had engaged in "affirmative misconduct," since

---

5. Since the Trustee was unable to consummate a sale within the initial extension period, the court later granted the Trustee another extension.

6. We review the equitable estoppel ruling under a mixed standard, assessing the legal conclusion *de novo* and all factual findings for clear error. *See Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1028 (9th Cir.1996); *Marine Transp. Servs. Sea–Barge Group, Inc. v. Python High Performance Marine Corp.*, 16 F.3d 1133, 1138 (11th Cir.1994); *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed.Cir.1991).

7. As a threshold matter, HHS contends that the bankruptcy court lacked subject matter jurisdiction to declare the one-year HHS deadline inoperative, because Congress has established an exclusive administrative/judicial appeals process governing HHS reimbursements, *see* 42 U.S.C. § 1395ii (incorporating *mutatis mutandi* § 405(h) of the Social Security Act, which provides that no HHS decision "shall be reviewed by any person, tribunal, or governmental agency except as herein provided," and that "[n]o action against [HHS] shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter"), a process which the Trustee has yet to exhaust. *See Heckler v. Ringer*, 466 U.S. 602, 614–17, 104 S.Ct. 2013, 2021–23, 80 L.Ed.2d 622 (1984) (barring all pre-exhaustion actions by courts where both "the standing and substantive basis" for the claim arise under the Medicare statute). On the other hand, the Trustee argues that § 405(h) plainly bars pre-exhaustion judicial review only in those courts whose jurisdiction arises under 28 U.S.C. §§ 1331 and 1346, whereas bankruptcy court jurisdiction in the instant case arises under 28 U.S.C. § 1334. As the jurisdictional issue is problematic, *compare, e.g., In re Town & Country Home Nursing Servs., Inc.*, 963 F.2d 1146, 1155 (9th Cir.1991), *with In re Upsher Labs., Inc.*, 135 B.R. 117, 119–20 (Bankr.W.D.Mo.1991), and the merits of the Trustee's appeal are not, *see infra*, we elect to bypass the jurisdictional issue at this time. *See Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489, 492 (1st Cir.) ("appellate court may bypass jurisdictional questions where appeal would falter on merits even assuming jurisdiction"), *cert. denied,* —— U.S. ——, 117 S.Ct. 2511, 138 L.Ed.2d 1014 (1997).

the United States Supreme Court has never embraced lower court decisions which require such proof where a party seeks monetary recoveries (*i.e.*, invading the public fisc). *See Schweiker v. Hansen*, 450 U.S. 785, 788, 101 S.Ct. 1468, 1470–71, 67 L.Ed.2d 685 (1981); *Akbarin v. INS*, 669 F.2d 839, 842 (1st Cir.1982). According to the Trustee, HHS should be estopped even assuming its earlier acquiescence was erroneous or inadvertent, as long as the Trustee reasonably relied to his detriment on the government's assurances. We conclude that the bankruptcy court erred.

All the authorities relied upon by the Trustee predated *Office of Personnel Mgt. v. Richmond*, 496 U.S. 414, 420–22, 110 S.Ct. 2465, 2469–70, 110 L.Ed.2d 387 (1990), in which the Supreme Court unequivocally observed that, at a bare minimum, its earlier precedents abjured any application of the doctrine of estoppel absent a showing of "affirmative misconduct" by the government. *See, e.g., LaFlower v. United States*, 849 F.2d 8, 11–12 (1st Cir.1988); *United States v. Ven–Fuel, Inc.*, 758 F.2d 741, 761 (1st Cir. 1985). The evidence adduced by the Trustee came up well short of the *Richmond* benchmark.

First and foremost, the Trustee and the bankruptcy court never afforded HHS itself a meaningful opportunity to respond to the § 413.24(f) extension motions; the first motion was never served on either the government or HHS, and the second motion was allowed by the bankruptcy court before HHS could file a formal response. *See supra* note 4. Second, the Trustee reads far too much into the oral assurances given by the Assistant United States Attorney (AUSA) in March 1995, who simply stated that the government did not intend to oppose extension of the forty-five-day deadline. As there was no mention or suggestion that any deadline extensions were to be predicated on Bankruptcy Code § 105(a), however, there can have been no implicit concession that the extensions the Trustee was seeking were within the equitable power of the bankruptcy court under Bankruptcy Code § 105(a).

Moreover, the government's ready acquiescence to the two earlier *forty-five-day* extensions is hardly remarkable, given that the HHS regulations themselves permit HHS to grant such extensions in various extenuating circumstances. *See* 42 C.F.R. § 413.24(f)(2)(ii) (hospital may obtain extension of 45–day deadline if its operations are "significantly affected due to extraordinary circumstances over which the [hospital] has no control, such as flood or fire"); *id.* § 405.1885 (hospital may be allowed to reopen and amend final cost report for up to three years). Whereas the *one-year* deadline prescribed in 42 C.F.R. § 413.134(f)(3) is subject to no such exceptions.

We therefore conclude that the Trustee reasonably could not have relied upon the oral assurances received from the AUSA regarding a regulatory deadline (*viz.,* § 413.24(f)), materially distinct from the one-year deadline prescribed in 42 C.F.R. § 413.134(f)(3), as a basis for inferring a blanket government concession relating to the bankruptcy court's equitable power to override HHS regulatory deadlines. The estoppel claim accordingly fails.[8]

**B. Administrative Deadline Extensions Under Bankruptcy Code Section 105(a)[9]**

The Trustee next contends that section 105(a) empowers the bankruptcy court to "harmonize" the Medicare statute, and its implementing regulations, with the Bankruptcy Code.[10] He points out that

---

**8.** These same principles likewise encumber any application of the law-of-the-case doctrine in these circumstances. *See Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 72 F.3d 190, 197–98 (1st Cir.1995) (noting that law-of-the-case doctrine applies only to sequential rulings on *same* issue).

**9.** Following an intermediate appeal, we review *de novo* the conclusions of law made by the district court. *See LaRoche v. Amoskeag Bank* (*In re LaRoche*), 969 F.2d 1299, 1301 (1st Cir. 1992). Its interpretation of Bankruptcy Code § 105(a) presents a pure question of law as well. *See In re Jarvis*, 53 F.3d 416, 418 (1st Cir.1995).

**10.** Section 105(a) provides, in pertinent part: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

whereas Code provisions are designed generally to facilitate chapter 7 estate-property recoveries for the benefit of unsecured creditors, *see, e.g.,* Bankruptcy Code § 363(f) (allowing chapter 7 trustee to sell property "free and clear" of liens), the one-year HHS deadline for hospitals to conduct capital-asset sales through a chapter 7 trustee, *see* 42 C.F.R. § 413.134(f)(3), arbitrarily undermines efforts to preserve and maximize creditor recoveries by working a hypertechnical forfeiture of the depreciation-adjustment credit to which the debtor Hospital was otherwise entitled.

The Trustee thus characterizes the thrust of the challenged filing deadline as an unfair administrative effort to reduce HHS's monetary exposure to a minimum. As the Trustee sees it, even assuming that any such administrative aim comported with congressional intent, *see, e.g., Northwest Hosp., Inc. v. Hospital Serv. Corp.,* 687 F.2d 985, 995 (7th Cir.1982) (invalidating HHS regulation imposing "blanket disallowance" rule which did not serve purposes of Medicare statute), whatever legitimate purpose is served by the HHS deadline is as well served by the equitable remedy fashioned by the bankruptcy court under section 105(a): allowing the Trustee to file the § 413.134(f)(3) claim but employing the appraised value of the Hospital's capital assets at the one-year anniversary of its closure, rather than the sale price obtained after the one-year period expired. Thus, according to the Trustee, the bankruptcy court's harmonization of legitimate Code objectives and Medicare program concerns avoided any inequitable result while precluding a "windfall" to HHS.

■ Section 105(a) empowers the bankruptcy court to exercise its equitable powers—where "necessary" or "appropriate"—to facilitate the implementation of other Bankruptcy Code provisions. *See supra* note 10. Although expansively phrased, section 105(a) affords bankruptcy courts considerably less discretion than first meets the eye, and in no sense constitutes " 'a roving commission to do equity.' " *Chiasson v. J. Louis Matherne & Assocs.* (*In re Oxford Mgt., Inc.*), 4 F.3d 1329, 1334 (5th Cir.1993) (citation omitted). *See In re Lapiana,* 909 F.2d 221, 224 (7th Cir.1990); *Bundy v. Donovan* (*In re Donovan* ), 183 B.R. 700, 702 (Bankr.W.D.Pa.1995) (same). Instead, the equitable discretion conferred upon the bankruptcy court by section 105(a) "is limited and cannot be used in a manner inconsistent with the commands of the Bankruptcy Code." *In re Plaza de Diego Shopping Ctr., Inc.,* 911 F.2d 820, 824 (1st Cir.1990). These limitations have been variously described.

[6] First, Bankruptcy Code § 105(a) may not be invoked to alter substantive debtor rights defined under the applicable nonbankruptcy law. *See, e.g., Bird v. Carl's Grocery Co.* (*In re NWFX, Inc.*), 864 F.2d 593, 596 (8th Cir.1989) ("An 'equitable setoff' such as that fashioned by the bankruptcy court in the present case is not a proper use of the bankruptcy court's equitable powers because it creates new substantive rights for the parties . . . ."); *see also In re Continental Airlines Corp.,* 907 F.2d 1500, 1509 (5th Cir.1990) (holding that § 105(a) does not permit substantive modifications of labor agreement).

Following along these lines, the Secretary asserts that the Hospital's substantive right to claim a capital-asset depreciation-adjustment credit was automatically extinguished because no capital-asset sale occurred within the one-year period prescribed in § 413.134(f)(3), and that an extinguished right cannot be resurrected under section 105(a). *See In re Chicago, Milwaukee, St. Paul & Pac. R.R.,* 791 F.2d 524, 528 (7th Cir.1986) ("The fact that a [bankruptcy] proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his [or her] personal views of justice and fairness, however enlightened those views may be."). The maxim relied upon by the Secretary reveals less than the complete picture, however, unless its application is attuned to the particular context.

■ Congress quite obviously intended to invest debtor estates and their representatives with certain rights, some of which *may augment* prepetition rights possessed by the debtor under nonbankruptcy law. *See Johnson v. First Nat'l Bank of Montevideo,* 719 F.2d 270, 273 (8th Cir.1983) (noting:

"[W]here Congress has enacted bankruptcy legislation which conflicts with state law, state law must yield."). But since section 105 *itself* is not a source of new substantive rights, the bankruptcy court may invoke section 105(a) only if the equitable remedy utilized is demonstrably necessary to preserve a right elsewhere provided in the Code. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 968, 99 L.Ed.2d 169 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can be exercised within the confines of the Bankruptcy Code"; "[u]nder this section, a court may exercise its equitable power only as a means to fulfill some specific Code provision."); *Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305, 1311 (1st Cir.1993) ("[S]ection 105(a) [does not] authorize courts to create substantive rights that are otherwise unavailable under the Code, or to expand the contractual obligations of parties."); *In re Dillon*, 194 B.R. 533, 536 (Bankr.S.D.Fla.1996).

In this vein, the Trustee argues, the Hospital was entitled to the deadline extensions granted by the bankruptcy court since this is the sort of "technical" accommodation that tends to maximize the overall value of the chapter 7 estate, hence fits within the penumbra—if not the express terms—of Bankruptcy Code § 363.[11] We need not address the two maxims mentioned above, however, as there is a sounder foundation for the district court's conclusion. *See Baybank–Middlesex v. Ralar Distribs., Inc.*, 69 F.3d 1200, 1202 (1st Cir.1995) (court of appeals may affirm district court on any ground disclosed in the record); *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1253 n. 9 (1st Cir.1991) (same).

■ The bankruptcy court may not utilize section 105(a) if another, more particularized Code provision—here, section 108(b)—impedes the requested exercise of equitable power. *See In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir.1993) ("By the same token, when a specific Code section addresses an issue, a court may not employ its equitable powers to achieve a result not contemplated by the Code."); *Landsing Diversified Props. v. First Nat'l Bank & Trust Co. (In re Western Real Estate Fund, Inc.)*, 922 F.2d 592, 601 (10th Cir.1990) ("[A] bankruptcy court's supplementary equitable powers [under § 105(a) ] may not be exercised in a manner that is inconsistent with the other, more specific provisions of the Code."), *modified on other grounds*, 932 F.2d 898 (10th Cir.1991); *Continental Airlines*, 907 F.2d at 1509; *Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1198 n. 10 (7th Cir.1989) (same); *Carter v. Peoples Bank & Trust Co. (In re BNW, Inc.)*, 201 B.R. 838, 847 (Bankr. S.D.Ala.1996) ("When the Bankruptcy Code establishes a right explicitly, a bankruptcy court cannot expand or contract that right implicitly through use of equitable powers."); 2 Lawrence P. King, *Collier on Bankruptcy*, ¶ 105–5 (15 ed.1996) (§ 105 does not "override explicit mandates of other sections of the Bankruptcy Code or mandates of other state and federal statutes.") (citations omitted); *see also, e.g., Chiasson*, 4 F.3d at 1334 ("This [payment] order effectuated an impermissible substantive alteration of the Code's provisions."). Unfortunately, however, by focusing exclusively on the two principles first discussed above, the parties managed to parry the legitimate concerns harbored by the bankruptcy court regarding the dissonant theme reflected in section 108(b), to which we now turn.

■ Bankruptcy Code § 108(b) states:

Except as provided in subsection (a) of this section, *if applicable nonbankruptcy law*, an order entered in a nonbankruptcy proceeding, or an agreement *fixes a period within which the debtor* or an individual protected under section 1201 or 1301 of this title *may* file any pleading, demand,

---

11. Bankruptcy Code § 363 provides, in relevant part:

The trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

11 U.S.C. § 363(b)(1). The Trustee interprets the quoted provision as necessarily implying that a trustee has the right "to liquidate property of the Debtor's estate at any time and under any circumstances that would prove beneficial to the Debtor's estate," unless other provisions of § 363 expressly prohibit the Trustee's choice of timing or circumstances.

notice, or proof of claim or loss, *cure a default, or perform any other similar act, and such period has not expired before the* date of the filing of the *petition, the trustee may only* file, *cure, or perform,* as the case may be, *before the later of—*

    (1) *the end of such period,* including any suspension of such period occurring on or after the commencement of the case; *or*

    (2) *60 days after the order for relief.*

11 U.S.C. § 108(b) (emphasis added). The bankruptcy court considered, *sua sponte,* whether section 108(b) precluded its reliance on section 105(a) as authority for extending the one-year regulatory deadline imposed by the HHS regulation.[12] It received no aid from the parties, however, as the Trustee and the Secretary *agreed* below that (i) section 108(b) was inapposite because the Trustee was not seeking an extension to *file a proof of claim,* and (ii) section 108(b) applies to "filing deadlines" only. The parties likewise noted that 42 C.F.R. § 413.134(f)(3) merely requires the Trustee to consummate a capital-asset sale by the first anniversary of the Hospital's closure, not that the Trustee need have filed the § 413.134(f)(3) depreciation-adjustment claim within the one-year period. The cramped construction accorded section 108(b) by the parties cannot stand.

Under its plain terms, as abundantly indicated, *inter alia,* by its inclusion of the generic phrase "cure a default," section 108(b) is not restricted to trustee initiatives that may be characterized as "filings." For one thing, a "cure" for a default need involve no "filing" at all, depending on the particular circumstances. Yet more importantly, section 108(b) also contains the catchall phrase: or "perform any other similar act." *See Autoskill, Inc. v. National Educ. Support Systems.,* 994 F.2d 1476, 1484 (10th Cir.1993) ("Although § 108(b) does not specifically refer to notices of appeal, the statute includes a broad catchall extending the time in which a debtor or trustee may 'perform any other

similar act' in addition to the steps listed."); *In re G–N Partners,* 48 B.R. 462, 467 (Bankr. D.Minn.1985) ("[T]hat § 108(b) is 'broader' than the listed items 'is obvious from its reading.' ") (citation omitted).

Thus, the pertinent inquiry in construing section 108(b) in the present context is whether all the undertakings expressly enumerated in it share some common characteristic. We think the answer is evident, since each undertaking enumerated in section 108(b) contemplates the exercise of a right, or the performance of a duty, prescribed by nonbankruptcy law in the prepetition environment encountered by the debtor, failing which any related prepetition legal right would be forfeit.

Moreover, even assuming the term "similar," as used in section 108(b), *see supra* p. ——, were less than unambiguous, its legislative history is clear beyond cavil. Section 108(b) was designed to "permit the trustee, when he steps into the shoes of the debtor, an extension of time for filing an action *or doing some other act that is required to preserve the debtor's rights.*" H.R.Rep. No. 95–595, at 318 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6275; *see also* S.Rep. No. 95–989, at 30 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5816 (same). *See* 1 Lawrence P. King, *Collier on Bankruptcy* ¶ 108.03, at 108–6 (15th ed.1991) (noting that Congress included § 108(b) "so that the trustee could take the necessary steps to preserve for the estate rights which might otherwise be barred"); *accord First Nat'l Fidelity Corp. v. Perry,* 945 F.2d 61, 65 (3d Cir.1991) (holding that extension of time for exercising state-law right to redeem foreclosed property from 3 to 5 years would contravene § 108(b)(2), which limits extensions to 60 days); *Counties Contracting & Constr. Co. v. Constitution Life Ins. Co.,* 855 F.2d 1054, 1058 n. 4 (3d Cir.1988) (holding that § 108(b) pertains to payment of insurance policy premium during grace period, "an act necessary to continue the policy in effect");

---

12. There is no dispute that the Medicare statute and the HHS regulation qualify as "applicable nonbankruptcy law" under § 108(b). *See Gladwell v. Harline (In re Harline),* 950 F.2d 669, 674 (10th Cir.1991) ("Sections 108(a), (b) & (c) all use the phrase 'applicable nonbankruptcy law,'

and courts have held that phrase in these subsections refers to federal law.") (collecting cases); *Eagle–Picher Indus., Inc. v. United States,* 937 F.2d 625, 639–40 (D.C.Cir.1991) (Federal Tort Claims Act is "applicable nonbankruptcy law" under § 108(b)).

*Whispering Bay Campground, Inc. v. Fagan (In re Whispering Bay Campground, Inc.),* 850 F.2d 443, 445–46 (8th Cir.1988) (same; redemption rights under Minnesota law).

The outer reaches of section 108(b), in relation to contractual time limitations other than "filing" deadlines, remain in sharp dispute. *Compare, e.g., Good Hope Refineries, Inc. v. Benavides,* 602 F.2d 998, 1002–03 (1st Cir.1979) (holding that neither Bankruptcy Act § 11(e) nor its successor, Bankruptcy Code § 108(b), afforded trustee 60–day extension to exercise option contract), *with In re Santa Fe Dev. & Mortgage Corp.,* 16 B.R. 165, 167–68 (9th Cir. BAP 1981) (holding that § 108(b) extends "option contract" for 60 days). These disputes are no less likely where, as here, the deadline is fixed not by contract but by "applicable . . . law" (*viz.,* the Medicare statute), but involves something more than a paper filing.

In all likelihood the applicability of section 108(b) will be decided on a case-by-case basis until the provision is clarified by Congress or the Supreme Court. Regulatory deadlines are clearly embraced by section 108(b)'s reference to "applicable nonbankruptcy law," and section 108(b) cannot be wholly limited to paper filings, since it refers to default cures. For the present we are satisfied that the one-year sale requirement is sufficiently linked to an ongoing HHS proceeding to invoke section 108(b) and that no pertinent consideration makes its application inappropriate.

■ In the present context, an indispensable undertaking to preserve the Hospital's prepetition right to claim a capital-asset depreciation adjustment from HHS was the sale of its capital assets, and the applicable HHS regulations unconditionally fixed the deadline for doing so at one year from the date the Hospital ceased its participation in the Medicare program. Accordingly, under the plain terms of section 108(b) the fact that the Trustee would have had to take a *further* step after the sale, in order to preserve the right of the chapter 7 estate to any such adjustment (*i.e.,* file a formal § 413.134(f)(3) claim with HHS), was altogether immaterial in the present circumstances because *both* undertakings were necessary to protect the Hospital from an irremediable forfeiture of its rights under the applicable nonbankruptcy law.

Thus, although section 108(b) obviously allows the trustee in bankruptcy a sixty-day grace period unavailable to the prepetition debtor, it just as plainly bespeaks a legislative intent to cut off the extension period, either at 60 days from the filing of the chapter 7 petition or upon the expiration of any remaining prepetition period, whichever occurs later. *See, e.g., Johnson,* 719 F.2d at 277–78 (holding that bankruptcy court cannot use § 105(a) to extend period for redeeming property under state law, a matter within § 108(b)'s ambit).[13]

The Trustee complains, nevertheless, that it is unrealistic to expect a newly appointed trustee to marshal estate assets within sixty days of the petition, let alone sell all the capital assets. Even though this may well be a compelling policy consideration, however, Congress nonetheless surely envisioned that it might be difficult to meet the sixty-day deadline imposed by section 108(b)(2) in some circumstances. Yet it chose to legislate no exception.[14]

---

**13.** We allow, however, that § 108(b) may not invariably bar relief; for example, where a more specific Code provision unambiguously provides an extension incompatible with the 60–day provision in § 108(b)(2). *See, e.g., Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1215 (7th Cir.1984) ("We hold, however, that section 108(b) does not apply to curing defaults in executory contracts. Section 365 specifically governs the time for curing defaults in executory contracts, and thus, it controls here."). The Trustee argues that § 363(b) is such a Code provision, because its aim is to maximize the recoveries realized from sales of estate assets. *See supra* note 11. Nevertheless, it is undisputed that § 363(b) provides no express extension which could be thought to trump § 108(b)(2). Furthermore, the extension sought by the Trustee had nothing to do with facilitating a *sale* of estate assets, as distinguished from *preserving* to the debtor a right in other property (*viz.,* HHS depreciation allowances) which happened to hinge on the timely occurrence of a sale of capital assets. On this collateral matter, Congress left § 363 conspicuously silent.

**14.** Competing policy considerations were at work here as well. Thus, for example, § 108(b)(2) affords contingent obligors of a chapter 7 estate—like HHS—a modicum of finality.

Furthermore, the Trustee has not alleged that HHS was responsible for any delay in selling the Hospital's capital assets. *Compare Johnson*, 719 F.2d 270, 274–75 ("There is no claim that [appellant] or any other party was guilty of any wrongdoing which adversely affected the debtors' ability to redeem the property within the statutory period. '[E]quity is available to protect property rights of the innocent debtor from the wrongful acts of other persons; however, equity does not extend to situations in which the debtor is simply unable to make the required payment within the prescribed time.'") (citation omitted), *with Otoe County Nat'l Bank v. Easton (In re Easton)*, 882 F.2d 312, 315–16 (8th Cir.1989) (departing from *Johnson* holding where "bad faith" has been demonstrated).

Although chapter 7 creditors may be deprived of potential recoveries unless the trustee is able to sell a capital asset in time to preserve the debtor estate's right to a postpetition capital-asset depreciation adjustment from HHS, we are not at liberty "to redistribute rights in accordance with [our] personal views of justice and fairness." *Chicago, Milwaukee, St. Paul & Pac. R.R.*, 791 F.2d at 528. *See Heyman v. M.L. Marketing Co.*, 116 F.3d 91, 1997 WL 324382, at *5 (4th Cir. June 16, 1997) (No. 95–2929) ("Bankruptcy filings often result in procedural confusion. Congress anticipated this confusion and made allowances for it. Among other provisions, 11 U.S.C. § 108(b) provides trustees with at least sixty days to take control of a case and to make appropriate filings."). Rather, once Congress has weighed the competing policy concerns affecting the scope of relief available under section 108(b), *see supra* note 14, we must abide its legislative decision unless it infringes a constitutional mandate. *See Pressimone v. I.R.S. (In re Pressimone)*, 39 B.R. 240, 246 (N.D.N.Y.1984) ("Courts [invoking § 105(a)] ... have expressed a laudable concern for the rehabilitation of debtors ... [but] in so doing ... have independently weighed the competing policy objectives at stake, thereby substituting their own judgment for that of Congress."). In the present circumstances, therefore, the appropriate recourse for trustees in bankruptcy institution-

ally overburdened by a § 413.134(f)(3) deadline, or for the creditor interests adversely affected thereby, is not through 11 U.S.C. § 105(a), but congressional amendment of section 108(b), or a rule-making modification to 42 C.F.R. § 413.134(f)(3), *see id.* § 1395x(v)(1)(O)(ii).

## III

### CONCLUSION

Since Bankruptcy Code § 105(a) affords the bankruptcy court no equitable power to extend the one-year HHS deadline imposed by 42 C.F.R. § 413.134(f)(3), and its extension is impermissible under Bankruptcy Code § 108(b) as well, the district court judgment is *affirmed.* The parties shall bear their own costs.

***SO ORDERED.***